EMPIRE WATER & POWER CO. et al. v. CASCADE TOWN CO.

(Circuit Court of Appeals, Eighth Circuit. April 4, 1913.)

No. 3,592.

1. WATERS AND WATER COURSES (§ 21*)—APPROPRIATION—RIPARIAN RIGHTS OF PATENTEE.

Under Rev. St. §§ 2339, 2340 (U. S. Comp. St. 1901, p. 1437), which provide that the owners of vested water rights, recognized and acknowledged by the local customs, laws, and the decisions of the courts, shall be maintained and protected in the same, and that (section 2340) all patents granted or pre-emptions or homesteads allowed shall be subject to any vested and accrued water rights as may have been acquired under or recognized by the preceding section, a patentee of public lands in a state acquires only such riparian rights as are given by the laws of the state.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 14; Dec. Dig. § 21.*]

2. PUBLIC LANDS (§ 114*)—RIPARIAN RIGHTS OF PATENTEE.

While the title of the United States to public lands before patent is absolute, and Congress may by legislative act establish any rule it chooses with respect to the ownership and use of the waters thereon under Const. art. 4, § 3, conferring the power to make all needful rules and regulations respecting the territory or other property of the United States, this supreme power is an attribute of sovereignty and not one of ordinary proprietorship; and when such lands are conveyed to private individuals no especial rights or exemptions, which might have been, but were not, prescribed, pass to the patentee.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 314–322; Dec. Dig. § 114.*]

3. WATERS AND WATER COURSES (§ 128*)—RIPARIAN RIGHTS—LAW OF COLORADO.

There has not been any statutory adoption of the common law for the United States, but the states have been left free to adopt so much of it as deemed applicable to their institutions and conditions. The common law of riparian ownership in all of its features, including the right to have the water of a stream flow in its accustomed channel, has never been adopted or in force in Colorado; but water rights in that state are fixed and determined by the state Constitution (article 16, § 6) and the legislation in conformity thereto, which authorize the diversion of the unappropriated water of a stream for beneficial uses, with priority of right to the first appropriator, where the uses are the same, and preference to users for domestic, agricultural, and manufacturing purposes in the order named in case of deficiency.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 143; Dec. Dig. § 128.*]

4. WATERS AND WATER COURSES (§ 132*)—APPLICATION OF WATER—BENEFICIAL USE.

Complainant, which is a private corporation, owns several hundred acres of land in Ute Pass, Colo., a few miles from Colorado Springs, including Cascade Canon, through which Cascade creek, a short but precipitous stream, having its source on a slope of Pike's Peak, flows in a series of falls and rapids, the mist and spray from which produce an exceptionally luxuriant growth and variety of trees, shrubbery, and flowers on the floor and sides of the canon. Complainant, during 20 years or more, has expended large sums of money in making a summer resort on its lands. It has built hotels, cottages, roads, and trails and a waterworks plant, and has laid out and dedicated to the public a park

in the canon, having a lake, fountain, pavilion, and an auditorium for conventions, etc. In maintaining all these improvements complainant uses water from the creek. *Held*, that its expenditures and improvements sufficiently evidence an intention to appropriate the waters of the stream to the purposes of its enterprise; that, so far as necessary to the use and maintenance of its buildings and other improvements, such application is to a beneficial use, within the meaning of the Constitution and laws of the state; that, as against one seeking to divert the waters for manufacturing purposes, it is entitled to the use of such further quantity of water as will be sufficient, economically applied, to preserve the trees and vegetation of the canon, which are a valuable part of its property devoted to a legitimate and useful purpose, but that under such Constitution and laws it is not entitled to have the stream flow in its natural way, without diminution, solely for the preservation of the scenic beauty of the falls.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 132.*]

Appeal from the Circuit Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Suit in equity by the Cascade Town Company against the Empire Water & Power Company and others. Decree for complainant, and defendants appeal. Reversed.

For opinion below, see 181 Fed. 1011.

This is an appeal from a decree in favor of the Cascade Town Company perpetually enjoining the Empire Water & Power Company and its officers from interfering with the normal flow of the waters of a stream in Cascade Canyon, near Colorado Springs, Colo. The facts appear from the statement of the trial court, as follows:

"Complainant, the Cascade Town Company, owns several hundred acres of land up Ute Pass, about 11 miles from Colorado Springs. Fountain creek flows through Ute Pass in an easterly direction, and as it passes the lands of the complainant company its waters are augmented by those of Cascade creek, short in length of flow, but precipitous, which come down from the watershed of the northerly slope of Pike's Peak to the westerly. The said complainant company and its predecessors in title have owned these lands for many years, and began improving them as a summer resort more than 20 years ago, and have maintained them as such ever since, and have not sought to utilize them otherwise. For that purpose they have constructed hotels there and built cottages, roads, and trails on its land extending up through Cascade Canon, through which the stream of the same name flows, and on beyond into the mountains, laid out, dedicated to the public, and improved a small park in said canon, made a lake and fountain, built a pavilion or auditorium for conventions, and otherwise improved its grounds, thereby adding to the attractions of the place as left by nature. The complainant company and its predecessors are not, and were not, municipal corporations, but business ventures created for the purpose of maintaining their property as a resort for tourists during the summer season. The place is known as Cascade. The Midland Railway, which traverses Ute Pass, has a station there. The complainant company has sold some of its property to persons who desired to improve the same as summer homes, one of whom has spent about $15,000 in improving his home on land bought from the company, lying on both sides of Cascade creek just below the canon. The company obtains an income from those who stop at its hotels and enjoy other accommodations which it offers. It has spent a large amount of money in improvements. The roads and trails up Cascade Canon and on into the mountains were constructed at an expense of $15,000 or $20,000. It also built a small waterworks to supply the cottages and its hotels. It advertises the place for the purpose of inducing the public to go there, and

for the past quarter of a century it has been visited annually by 12,000 or 15,000 people. It has a permanent population of 50 or 60 people. Among other attractions held out in its advertisements are Cascade Canon and the falls of Cascade creek through the canon. The canon and falls are rare in beauty and constitute the chief attraction. Without them the place would not be much unlike any other part of Ute Pass. The canon is about three-quarters of a mile long and very deep: its floor and sides are covered with an exceptionally luxuriant growth of trees, shrubbery, and flowers. This exceptional vegetation is produced by the flow of Cascade creek through the canon and the mist and spray from its falls. Some of these falls are as much as 30 feet in height, but the difference in elevation between the foot and the head of the canon is so great that the falls are almost continuous from the head down. The volume of water is the greatest during the summer season. It comes from the melting snows on the north slope of Pike's Peak. But the flow is fairly even, due to the fact that the upper stretches of the watershed are composed of disintegrated granite into which the water first sinks and gradually percolates until gathered into the bed of the stream. The volume is said to be equivalent to a stream about 8 feet wide and 6 to 8 inches in depth. The vegetation in the canon and up its sides consists, in part, of pine, spruce, fir, balsam, aspen, black birch, Japanese maple, thimbleberry, wild cherry, choke cherry, and aster, columbine, larkspur, wild rose, the red raspberry, wild gooseberry, ferns, mosses, and many other kinds of trees, shrubs, and flowers. The stream is annually stocked with trout. The birds which are found in the canon, some grouse, a few squirrels, and perhaps a few other wild animals there, are protected by the complainant company. The complainant called a florist of 25 years' experience and a landscape gardener of 35 years' experience as witnesses. They tell us that the native flora of the country is quite extensive in Cascade Canon; that the evergreen features are perfect; that there are 3 or 4 varieties of pines, 3 of juniper and 3 of spruce, probably 25 varieties of native shrubs, about 50 varieties of native perennials, and several varieties of moss growth, and a large variety of wild flowers and flowering shrubs; that the waterfalls create a spray and mist which, together with the underground seepage down the sides of the canon, produce this very luxuriant growth, there being at least 200 varieties of vegetation; and that it is far superior in that respect to any other canon in the neighborhood, and exceptional. The seepage and the mist and spray give life to the foliage.

"The defendant was incorporated for the purpose, among other things, of generating electricity by water power, and to dispose of the same as a commodity; and to execute that purpose it sent its agents on to the watershed of Pike's Peak, above the head of Cascade Canon, and located a reservoir site and did some acts, at small expense, looking to the execution of that purpose, whereby it intended and expected to impound the waters in such reservoir and later conduct it in pipes down the mountain to and beyond the property of the complainant company. And thereupon these complainants filed their several bills asking that the defendant be enjoined from so doing, as a threatened injury to their vested rights.

"It is found as a fact that if the defendant do impound the waters of Cascade creek above the falls and conduct it therefrom in pipes, as aforesaid, the falls in the canon and the vegetation on its floor and sides will be largely, if not wholly, destroyed, and the canon hence become a dry gulch, and that all the waters flowing in said stream are needed by complainant company, and are necessary for the aforesaid purposes to which they have been applied by said complainant."

R. L. Holland, of Colorado Springs, Colo. (Willis L. Strachan, of Colorado Springs, Colo., on the brief), for appellants.

Charles Blood Smith, of Topeka, Kan., and H. S. Lewis, of Hutchinson, Kan. (Fairchild & Lewis, of Hutchinson, Kan., on the brief), for appellee.

Before SANBORN, HOOK, and SMITH, Circuit Judges.

HOOK, Circuit Judge (after stating the facts as above). [1] The first question in this case is whether the complainant, the Cascade Town Company, by its ownership of lands in Colorado conveyed by patent of the United States, is possessed of riparian rights as at common law, free from public taking or restrictive regulation save by the exercise of the power of eminent domain. The lands were patented to complainant's predecessors in title in 1880, 1889, and 1890, at which times sections 2339 and 2340, Rev. Stats. (U. S. Comp. St. 1901, p. 1437), were in force and constituted the only legislation by Congress affecting water rights of public lands in Colorado. The former, which was taken from Act July 26, 1866, c. 262, § 9, 14 Stat. 253, is as follows:

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage."

Section 2340, adopted from Act July 9, 1870, c. 235, § 17, 16 Stat. 218, provides that:

"All patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the preceding section."

Colorado was admitted as a state in 1876. Its Constitution (article 16, § 6) provides:

"The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes."

State legislation was afterwards enacted conforming to the constitutional provision and prescribing a system of administration. The patents issued by the United States to complainant's predecessors in title were qualified according to the provisions of the Revised Statutes above noted.

[2, 3] It is urged by complainant that the United States, as the owner of the lands while they were part of the public domain, was possessed of "every right" with respect thereto, including the common-law right of a riparian owner to have the water of a stream flow in its accustomed channel, regardless of its appropriation to beneficial uses, and that upon patent every such right passed to the patentee as property of which he could not be divested by the authority of the state without due process of law. This contention involves two assumptions which we think are inadmissible. Undoubtedly the title of the United States before patent was absolute, and Congress by legis-

lative act could have established any rule it chose with respect to the ownership and use of the waters. The power of Congress to "make all needful rules and regulations respecting the territory or other property belonging to the United States," conferred by the Constitution (article 4, § 3), is without limitation, and is free from state interference. United States v. Rio Grande, etc., Co., 174 U. S. 690, 703, 19 Sup. Ct. 770, 43 L. Ed. 1136. But this supreme power is an attribute of sovereignty, not one of ordinary proprietorship; and when in the disposition of the public domain lands are conveyed to private individuals no especial rights or exemptions, which might have been, but were not, prescribed, pass to the patentee. In the absence of anything showing the contrary, the government will be presumed to have taken the position of a private owner and to have intended that its conveyance as regards incidents of title not mentioned in the instrument should be construed according to the law of the state where the land lies. It has been so held as to a patent of land bounded on a nonnavigable lake and the question whether the patentee took the adjoining submerged land (Hardin v. Shedd. 190 U. S. 508, 23 Sup. Ct. 685, 47 L. Ed. 1156), and we see no reason why the principle is not applicable here. With its supreme authority over the public domain, Congress could have prescribed any rule respecting the flow and use of waters, whether it conformed or not to the local customs, laws, and judicial decisions, but a patentee does not impliedly succeed to all that might have been done. Nor is it correct to say that the title of the United States was as defined in the common law. On the contrary, it held the lands as a sovereign. Moreover, the common law of riparian ownership in all its features never obtained in Colorado. Snyder v. Dredging Co., 104 C. C. A. 136, 181 Fed. 62. It was unsuited to the region and would have tended greatly to prevent the very development which made the lands valuable. Express recognition of the local conditions and necessities is found in the acts of Congress above referred to and in the patents from which complainant derives its title. See 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136. The national Constitution speaks in the terms of the common law, and that law has been qualifiedly adopted by statute in many states. But there has been no statutory adoption of it for the United States. There its acceptance rests on judicial construction proceeding upon historical reasons and a general sense of suitableness, and like that of the states is qualified to a harmony with our institutions and conditions. It does not automatically apply over all the United States, its territories, and possessions as a blanket of unvarying thickness, but yields here and there to a universal recognition of necessity and propriety. For examples: Our test of the navigability of waters is not that of the common law (The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999); and we have quite generally denied the doctrine of ancient lights. It would be as illogical to impose the English doctrine of flowing waters upon Colorado as it would be to say judicially that their climate and soil and the imperative needs of their people are the same. Referring to Montana and Wyoming and the use of waters of nonnavigable streams, Mr. Justice Holmes said, in Bean v. Morris, 221 U. S. 485, 31 Sup. Ct. 703, 55 L. Ed. 821:

"The doctrine of appropriation has prevailed in these regions probably from the first moment that they knew of any law, and has continued since they became territory of the United States."

And so in Colorado. That rights may vary and be adjusted somewhat to the imperative necessities of natural conditions is also exemplified in Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171, and Strickley v. Mining Co., 200 U. S. 527, 26 Sup. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174.

[4] We therefore turn to what is commonly called the Colorado doctrine. The waters of natural streams in Colorado are subject to state regulation, and may be appropriated to beneficial uses for domestic, agricultural, and manufacturing purposes. That is the prescribed order of preference in case of deficiency. The defendants, who were enjoined, contemplated a use for manufacturing. In this branch of the case the controversy was over the character of complainant's use, its relation to that proposed by defendants, and the extent of complainant's appropriation and application of the water. It is urged that a use for a summer resort is not a beneficial use for either domestic or agricultural purposes. Counsel say that the views and standards of the early settlers were reflected in the state Constitution, and that it should be construed accordingly; that they did not plan for rest and recreation, and that to them "domestic" had to do with sustenance for man and beast, and cleanliness; and that "agricultural" related to the raising of crops. We think such a view is too narrow. If the commerce clause of the federal Constitution had been construed in that way, much of the growth of this country would have been arrested. In framing Constitutions wisdom frequently requires the use of general terms, which should be held as progressively adaptable to natural development and as open to embrace new instances as they arise and come clearly within the spirit of the provisions. Thus, in Lamborn v. Bell, 18 Colo. 346, 32 Pac. 989, 20 L. R. A. 241, the term "milling purposes" in the provision of the state Constitution authorizing the appropriation of private property was held broadly to include manufacturing purposes and specifically that of an electric power plant, though the milling of ore and grain was doubtless uppermost in mind when the Constitution was adopted. Places such as that described here, favored by climatic conditions, improved by the work of man, and designed to promote health by affording rest and relaxation are assuredly beneficial. They are relatively as important as sanitariums or hospitals, and should not be dismissed by calling them mere resorts for idleness. They are a recognized feature of the times, are important in their influence upon health, and multitudes of people avail themselves of them from necessity. Cascade is well described as a place of this kind. With its railroad station, hotels, cottages, waterworks, park, roads, and trails and its 12,000 or 15,000 annual visitors, it is a summer city. That it is not an incorporated municipality, but is largely a private venture, is, we think, unimportant. Nor need the purpose to which the waters of the stream are devoted be a single one of those named in the classification in the Constitution. It need not be exclusively domestic nor exclusively agricultural. It

may be and is both, like that of the ordinary city with its homes, business places, parks, and public grounds.

It is clear that complainant intended to appropriate the waters of the stream to its purpose. The intent was openly manifested by the extensive improvement of its property by buildings, roads, etc., in reliance, not only on the use of the water in the ditches that were constructed, but also on the continued natural falls and flow of the stream. At this point, however, we experience the most difficulty with complainant's case. The laws of Colorado are designed to prevent waste of a most valuable but limited natural resource, and to confine the use to needs. By rejecting the common-law rule they deny the right of the landowner to have the stream run in its natural way without diminution. He cannot hold to all the water for the scant vegetation which lines the banks but must make the most efficient use by applying it to his land. See Schodde v. Water Co., 224 U. S. 107, 32 Sup. Ct. 470, 56 L. Ed. 686, a case from Idaho, where a landowner claimed the whole current of a stream to raise part of the water to his land. The case before us is exceptional, but we think complainant is not entitled to a continuance of the falls solely for their scenic beauty. The state laws proceed upon more material lines. Complainant also relies upon the distribution by the falls of moisture for the trees and other vegetable growth on its lands, which it has extensively improved. As we have said, its intent to appropriate the waters has been shown by its expenditures and improvements beyond what is served by its ditches. Has there been that actual application which the law requires? Undoubtedly a landowner may rely upon an efficient application by nature, and need do no more than affirmatively to avail himself of it (Thomas v. Guiraud, 6 Colo. 530; Larimer, etc., Co. v. People, 8 Colo. 614, 9 Pac. 794); but the use in that way should not be unnecessarily or wastefully excessive. If all the water flowing over the falls, directly applied to the lands in the usual way of irrigation, would be required to produce the effect of the distributed mist and spray as now utilized, we think defendants would have no right to divert it for a manufacturing purpose. If nature accomplishes a result which is recognized and utilized, a change of process by man would seem unnecessary. But the trial court based its decision of this branch of the case largely upon the artistic value of the falls, and made no inquiry into the effectiveness of the use of the water in the way adopted as compared with the customary methods of irrigation. In all other respects the conclusions of the court were in accord with the views we have expressed. It may be that if the attention of the lawmakers had been directed to such natural objects of great beauty they would have sought to preserve them, but we think the dominant idea was utility, liberally and not narrowly regarded, and we are constrained to follow it.

As to some other matters: We think the trial court has jurisdiction of the subject-matter of the case, that the necessary amount or value is involved, and that complainant's bill is sufficiently broad for protection of its rights acquired by appropriation.

The decree of the trial court is reversed and remanded for further proceedings in conformity with this opinion.