STATE OF IOWA ex rel. L. L. WINTERFIELD, Appellant, v. HARDIN COUNTY RURAL ELECTRIC COOPERATIVE et al., Appellees.

No. 44537.

APRIL 4, 1939.

898

D. M. Kelleher, for appellant.

Stephens & Wisdom, James E. Coonley, F. J. Lund, and H. A. Willoughby, for appellees.

BLISS, J.—The relator is a citizen of Iowa, residing in Hardin county, and owning eighty acres of land in Franklin county. On September 30, 1936, he paid the membership fee of five dollars, and became a member of the defendant, Franklin Rural Electric Cooperative. Each of the defending County Rural Electric Cooperatives is a cooperative association organized pursuant to the provisions of chapter 94 of the Acts of the 46th General Assembly, now appearing as chapter 390-G1, section 8512-g1 et seq., of the 1935 Code of Iowa. On February 9, 1937, said defendants, through their respective presidents and secretaries, executed the ''Articles of Incorporation of Federated Cooperative Power Association'', purporting to organize, as an association, under said chapter, the defendant, ''Federated Cooperative Power Association''.

The relator, feeling aggrieved at such action, demanded of the county attorney of Hardin county, that he institute proceedings, under chapter 531, section 12417 et seq., of the Code of Iowa, requiring said cooperatives to show by what authority they had taken such steps to organize and act under said power association. Upon the refusal of the county attorney to so act, the relator, on August 11, 1937, procured from Judge Sherwood Clock, an order permitting the relator to institute such action as the county attorney had refused to take. Thereupon the relator, in the name of the State of Iowa, but upon his own relation, and through his own attorney, filed his petition, containing, among others, allegations stating the matters above set out, and also the following matters, in substance: that the county cooperatives had been organized to engage in the construction and operation of rural electric transmission lines in their respective counties to supply electricity to their members; that the cooperatives had no capital or funds and could purchase the necessary equipment only by borrowing money on the security

of the equipment purchased, to be repaid on an amortization plan in twenty years; that the only source of payment was from the profits made in the sale of electricity purchased as cheaply as possible in a competitive market, and not by the operation of generating plants, and feeder lines; that memberships had been solicited on such basis only, to the end that the current might be obtained at moderate prices and under conditions which would insure uninterrupted service; that any plan to obligate the associations to buy current from a single source with no safeguard that the cost would be reasonable would be fatal to the plan of the Cooperative Associations; that the Federated Cooperative Power Association is but a name under which the county cooperatives purport to act as a cooperative association, under pretense of having organized such association under the provisions of said chapter 94, but actually adopting the form of a cooperative association to accomplish objects not authorized by law, while not in fact organized under or for the objects authorized under said chapter, or being such a cooperative association; that the five county cooperatives are usurping powers under the name of said power association, not for the objects enumerated in said chapter, but in fact having as its sole object the generating and distributing to the five county cooperatives electric current generated at unknown and speculative monopoly rates from a single source, making uninterrupted service impossible, and burdening the members of the cooperatives with a debt as will result in a complete failure of the original enterprises; that it is a part of the plan of the five county cooperatives to borrow more than $400,000 to purchase generating and distributing equipment, and that thereby the members and consumers will be charged extravagant and preposterous rates and will be discouraged from retaining their membership and forced to abandon and sacrifice their investments. The last two paragraphs of the petition and the prayer are as follows:

"13.    Plaintiff avers that said five defendant county or local cooperative associations are not authorized or empowered by law to organize as a corporation said 'Federated Cooperative Power Association' for the objects in this petition described, or for any object other than some one object expressly enumerated in Section 6 of said Chapter 94 of the Acts of the

46th General Assembly. That the said five defendant county cooperative associations seek by means of the pretended organization of said 'Federated Cooperative Power Association' and by the acts in this petition described, to usurp corporate powers for objects not within the scope of the objects provided for in said Chapter 94 of the Acts of the 46th General Assembly. That said Federated Cooperative Power Association for the reasons in this petition set forth, is not organized for the purposes provided by said statutes and does not have as its sole object any one object enumerated in said statutes, and said defendants by and through said Federated Cooperative Power Association are exercising and attempting to exercise powers not conferred by law.

"14. That said five defendant county cooperative associations are by reason of the facts in this petition set forth, acting as a corporation without being authorized by law. That said pretended incorporation of Federated Cooperative Power Association is for the reasons in this petition set forth wholly unauthorized and void.

"Wherefore, plaintiff prays that the defendants, Hardin County Rural Electric Cooperative, Franklin Rural Electric Cooperative, Wright County Rural Electric Cooperative, Butler County Rural Electric Cooperative and Grundy County Rural Electric Cooperative be required to show by what warrant or authority they are acting under the name of Federated Cooperative Power Association as a pretended incorporated cooperative association; and by what warrant and authority said defendants are proceeding to create a debt of more than $400,000, for acquisition of an electric generating plant, building to house the same and feeder lines, and seeking by the plan and acts pursuant thereto described in plaintiff's petition, to impose upon the said five named county cooperative associations and their members respectively the burden of paying such price for electric current as will, over a period of twenty years, pay operating costs and the interest and principal of said debt of over $400,000; and by what warrant or authority they, the said five named county cooperative associations, in the manner and by the means set forth in the foregoing petition, intend to deprive the members of the said five county cooperative associations of the right of purchasing electric current at competitive market price. And plaintiff further prays that the acts of the said

five county cooperative associations purporting to be done through their presidents and secretaries in signing and filing the Articles of Incorporation, a copy of which is attached to this petition, attempting to create or incorporate a pretended entity under the name of Federated Cooperative Power Association for the purposes in the foregoing petition described, may be adjudged and decreed to be unauthorized and void, and that said five defendant county cooperative associations in all their acts described in plaintiff's petition be adjudged to have attempted to exercise corporate powers not conferred by law; and plaintiff prays judgment for costs.''

Briefly stated the grievance of the relator, as alleged, appears to be that the five county cooperatives are not authorized under said chapter 94, to organize the Federated Cooperative Power Association for the purpose of generating electric current alone, or in combination with transmission lines for its distribution, but only for the purpose of constructing and operating transmission lines, and that unless the purpose is restricted to the latter, the plan will be economically unsound and unworkable.

To his petition, the relator has attached, as an exhibit, the articles of incorporation of the power association. These articles, which appear to be in regular form, were filed in the office of the secretary of state, duly recorded therein and certificate issued by him. The objections raised by the appellant are confined to article IV. This article is necessary to an understanding of the matters involved, and is as follows:

''The purpose or purposes for which the Association is formed are:

''1. To generate, manufacture, purchase, acquire and accumulate electric energy and to transmit, distribute, furnish, sell and dispose of such electric energy; and to construct, erect, purchase, lease as lessee, and in any manner acquire, own, hold, maintain, operate, sell, dispose of, lease as lessor, exchange and mortgage plants, buildings, works, machinery, supplies, apparatus, equipment and transmission and distribution lines or systems necessary, convenient, or useful for carrying out and accomplishing any of the foregoing purposes;

''2. To manage, maintain and operate for its members the transmission, distribution and service lines or systems or any

other property or properties of its members and to advise, aid or assist therein;

"3. To purchase, receive, lease as lessee, or in any other manner acquire, own, hold, maintain, use, sell, convey, lease as lessor, exchange, mortgage, pledge or otherwise dispose of any and all real and personal property or any interest therein necessary, useful or appropriate to enable the Association to accomplish any and all of its purposes;

"4. To acquire, own, hold, use, exercise and, to the extent permitted by law, to sell, mortgage, pledge, hypothecate and in any manner dispose of franchises, rights, privileges, licenses, rights of way and easements necessary, useful or appropriate to accomplish any or all of the purposes of the Association;

"5. To borrow money, to make and issue bonds, notes and other evidences of indebtedness, secured or unsecured, for moneys borrowed or in payment for property acquired, or for any of the other objects or purposes of said Association; to secure the payment of such bonds, notes or other evidences of indebtedness by mortgage or mortgages, or deed or deeds of trust upon, or by the pledge of or other lien upon, all or any part of the property, rights, franchises, privileges or permits of the Association, wheresoever situated, acquired or to be acquired;

"6. To make advances and to extend credit to or for the account of the member-associations of the Association and to take any form of obligation or security therefor, to acquire, hold, transfer or pledge any note or other obligation, and to make any contract, endorsement or guaranty deemed desirable incident to the transfer or pledge of any such obligation, note or security;

"7. To do and perform any and all acts and things, and to have and exercise any and all of the foregoing purposes, or as may be permitted by the provisions of the laws under which this Association is formed; and to exercise any of its powers anywhere."

The five county cooperatives demurred to appellants petition, alleging as grounds that it appeared from the face thereof that: the relator was not entitled to relief; the demurring defendants were, at the time of the incorporation of the defendant power association, cooperative associations duly organized under chapter 94 of the 46th General Assembly (chapter 390-

G1, Iowa Code); that they were authorized to incorporate the power association, and it was duly organized under said chapters, and in compliance with their provisions and purposes; that the actions of the defendants in the financing of their affairs and the policy and the conducting of their business, and the procurement of electric energy, are all within their statutory authorization, and entitled the relator to no relief; that the incorporation of the power association was not for the purpose of forcing its members to purchase electric energy for resale from a single source or a monopolistic market; that the relator was a private citizen, and under the aforesaid legislation, under which all of the defendants were organized, the right of the power association to exist cannot be challenged by such private citizen, and that the court is without jurisdiction to try the cause, and the relator is not entitled to the relief prayed for, or any relief; and that the only issues raised are private grievances of the relator, and of no public concern, entitling him to any relief.

The defendant, Federated Cooperative Power Association, demurred on substantially the same grounds.

The trial court sustained the demurrers, and set forth his reasons at length, and rightly stated that many of the allegations of the petition were not material to the questions raised by the demurrers, which go to the merits of the case, and had no controlling effect on its ruling. The controlling questions presented by the demurrers as stated by the court, are: (1) Whether the articles of incorporation come within the purview of chapter 390-G1 of the 1935 Code of Iowa, or are the powers and purposes of said Power Association as declared in its articles so far outside of and beyond the purview of the statute as to render them void as a whole? (2) Is the relator authorized under the law to maintain this action?

We believe these questions reach the heart of the matter. We will take up the first question first. The pertinent statutory provisions are found in chapter 390-G1 of the 1935 Iowa Code, which was enacted by the 46th General Assembly, as chapter 94 of its Acts. As stated in the title of the Act, it is "An Act to revise and modernize the laws relating to cooperative corporations * * * to define their necessary and permissible powers and activities * * *." By it, chapter 389, section 8459 et seq., of the Code, dealing with "Cooperative Associations", and

chapter 390, section 8485-b1 et seq., of the Code, dealing with "Nonprofit-Sharing Cooperative Associations", were declared inoperative as to corporations chartered after July 4, 1935, but in force and effect as to all corporations organized thereunder prior to said date, so long as they may elect to operate under or renew their charters under said chapters. Code 1935, section 8512-g61.

Under section 8512-g3 of chapter 390-G1 cooperative associations may sell services to nonmembers up to half the value of the cooperative's business, and to municipal and governmental bodies, without limit.

Section 8512-g5 provides that two or more associations may organize an association. Under this section the five county associations were authorized to organize an association within the provisions of the chapter.

The sections bearing directly upon the issues of this case are 8512-g6, 8512-g7 and 8512-g10, which are here set out:

"8512-g6. Associations may be formed either:

"1. To conduct a mercantile, manufacturing, mechanical or mining business, or to construct or operate telephone or electric transmission lines; or

"2. To produce, grade, blend, preserve, process, store, warehouse, market, sell or handle any agricultural product, or any by-product thereof; or to purchase, produce, sell or supply machinery, petroleum products, equipment, fertilizer, supplies, business or educational service to or for those engaged as bona fide producers of agricultural products; or to finance any such activities; or to engage in any cooperative activity connected with any of said purposes; or for any number of these purposes."

"8512-g7. Except as expressly limited in its articles, each association shall have power to do anything permitted anywhere in this chapter, and also:

"To conduct any business enumerated in section 8512-g6 which its articles specify; and to conduct such business either as principal or as agent for its members.

"To borrow any amounts of money, and give any form of obligation or security therefor.

"To make advances to patrons or members, or members of member-associations, and take any form of obligation or security

therefor. To acquire, hold, transfer or pledge any obligation or security representing funds actually advanced or used for any cooperative activity; or stock, memberships, bonds or obligations of any cooperative organization dealing in any product handled by the association, or any by-product thereof; to make any contract, indorsement or guaranty it deems desirable incident to its transfer or pledge of any obligation or security. No association organized under this chapter shall engage in the business of banking. Provided, however, that nothing in this chapter shall be construed in any way to repeal or change chapter 415-B1, relating to cooperative banks.

"To acquire, own or dispose of any real or personal property deemed convenient for its business, including patents, trademarks and copyrights.

"To exercise any power, right or privilege suitable or necessary for, or incident to, promoting or accomplishing any of its powers, purposes or activities, or granted to ordinary corporations, save such as are inconsistent with this chapter.

"To exercise any of its powers anywhere."

"8512-g10. Any association may make any agreement or arrangement with any other association or cooperative organization for the cooperative or more economical carrying on of any of its business. Any number of such associations or organizations may unite to employ or use, or may separately employ or use, the same methods, means or agencies for conducting their respective businesses."

Since the suit was determined by a ruling on the demurrers to the petition, we must go to the petition for information as to the facts involved. It is there alleged that the five defendant county cooperatives were organized in the respective counties, by the farmers in each county with the object of engaging in the construction and the operation of rural electric transmission lines, for the sale and distribution of electric energy or current among the member and nonmember users in each county. It further appears that, after so organizing and operating, these county cooperatives agreed among themselves to organize the defendant, Federated Cooperative Power Association, having, as alleged, "as its sole object the generating and distributing to said five county or local associations electric energy or current." By their demurrers the defendants admit these facts.

In their argument they expressly assert that the five county cooperatives organized the Federated Cooperative Power Association with the purpose and object of procuring electric energy or current for distribution to members of the county cooperatives and other patrons. Paragraph 1 of article IV of the articles of incorporation of the power association states the purpose or purposes for which this association was formed, to be: "To generate, manufacture, purchase, acquire and accumulate electric energy and to transmit, distribute, furnish, sell and dispose of such electric energy; * * * ". The remaining provisions of the paragraph authorize the acquisition and construction of the equipment necessary to perform the above stated purpose. The appellees contend that all of this is but the authorization of a single object or purpose, or the conducting of a single business. On the other hand, the relator insists that the quoted part of the paragraph is contrary to section 8512-g6 of the Code, which provides:

"Associations may be formed *either*:

"1. To conduct a mercantile, manufacturing, mechanical or mining business, or to construct or operate telephone or electric transmission lines; *or*

"2. To produce, grade, blend, etc. * * *." (This subdivision refers to agricultural associations only.)

It is his contention that the quoted portion of the article is an authorization of not one, but three purposes or objects, and of not one business, but three businesses, or rather as he puts it, two businesses and a "line", since he contends that the constructing and operating of a telephone or telegraph line is not a "business", but is a "line". He further insists that an authorization to "conduct a mercantile, manufacturing, mechanical * * * business", as provided by this Code section, does not include or permit the "generation" or "purchasing" of electric energy. He also insists that the "generation" of electricity is not "manufacturing". He also urges that, if it be conceded that the "generation" or "purchasing" of electric energy comes within any of the terms, "mercantile, manufacturing, or mechanical, business", the word "or", just preceding the words "to construct", in the statute, should be given a "disjunctive" and not a "conjunctive" meaning. His expressed thought being that the legislature intended to use the

word in the disjunctive sense, and thereby said that, if the association manufactured or generated electric energy, it was engaged in one, single business, but if it also distributed its product by transmission lines, it was then engaged in another business, or two businesses all together, or, as he prefers, one business and a "line". In other words, that if an association, under its articles, produces electric energy for sale, and distributes it in the only manner possible, by line equipment, it violates the statute, in that it is authorized to and is engaged in two distinct businesses, and is accomplishing two distinct objects or purposes.

To us the position taken by the relator is strained and super-technical construction run riot. It was such construction, it seems to the writer, that Judges Van Valkenburgh, Kenyon and Davis had in mind, when, in Payne v. Ostrus et al., 8 Cir., 50 F. 2d 1039, 1042, 77 A. L. R. 531, they approved, by quoting, the language of Judge Sanborn, in Lynch v. Alworth-Stephens Co., 8 Cir., 294 F. 190, 194, stating:

"And the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover."

In short, the relator takes the stand, that under section 8512-g6, an association may incorporate only to engage in *either* a mercantile, manufacturing, mechanical or mining business, or to engage in the construction *and* operation of telephone lines, or to engage in the construction *and* operation of electric transmission lines. The relator concedes that the word "or" between the words "construct" and "operate", in the statute, should be given a "conjunctive" meaning, and be read as "and", since the legislature evidently mistakenly used "or" for "and", in that particular instance. He also concedes that one who is authorized to engage in a business of producing is impliedly authorized to market his product.

█ I. Directing attention more specifically to the relator's various contentions, we will refer briefly to whether any of the words, "manufacturing", "mechanical", or "mercantile", include the process of "generating" electric energy. Webster's dictionary defines the word "manufacture" thus: "to make by hand, by machinery, or by other agency; to work

raw materials into forms for use; to produce mechanically." It defines "generate" as meaning "to beget, produce, to cause to be, to produce an electric current." Taking the dictionary definitions alone, it appears to us that to generate or to produce an electric current, means nothing more than to manufacture, or to produce mechanically, such current. The great preponderance of authority as evidenced by the decisions of the courts supports the proposition that one engaged in the generation of electricity is engaged in a manufacturing or mechanical business.

The Idaho legislature passed an act levying a license tax on the *manufacture*, generation or production of electricity. In an action to enjoin the enforcement of the act, the United States Supreme Court, in Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 Sup. Ct. 548, on page 551, 76 L. Ed. 1038, on pages 1045 and 1046 of the latter report, said:

"Electrical energy has characteristics clearly differentiating it from the various other forms of energy, such as chemical energy, heat energy, and the energy of falling water.

"Appellant here, by means of what are called generators, converts the mechanical energy of falling water into electrical energy. Thus, by the application of human skill, a distinct product is brought into being and transmitted to the places of use. The result is not merely transmission; nor is it transmission of the mechanical energy of falling water to the places of consumption; but it is, first, conversion of that form of energy into something else, and, second, the transmission of that something else to the consumers."

And also, 286 U. S. 165, 52 S. Ct. on page 552, 76 L. Ed. on page 1047, it is said:

"We are satisfied, upon a consideration of the whole case, that the process of generation is as essentially local as though electrical energy were a physical thing, and to that situation we must apply, as controlling, the general rule that commerce does not begin until *manufacture* is finished, and hence the commerce clause of the Constitution does not prevent the state from exercising exclusive control over the manufacture."

Under a statute authorizing municipalities to exempt manufacturing establishments from taxation, one engaged in gen-

erating electricity for distribution and sale was held to be engaged in manufacturing by the Kentucky Court of Appeals in Kentucky Electric Co. v. Buechel, 146 Ky. 660, 38 L. R. A. (N. S.) 907, Ann. Cas. 1913C 714, 143 S. W. 58, and on page 60 of the latter report that court said:

"The heat units in the fuel are transformed into power, light, or heat units in the shape of electricity. It is merely the changing of energy from one form to another; but these units of energy, after they have been so transformed, are so changed that we think they may properly be termed 'manufactured.' They could certainly not be recognized; and when their form is so changed that they can no longer be recognized, to the average mind they are manufactured into a new product."

Under a statute authorizing the consolidation of manufacturing corporations, the Alabama court, in holding that an electric light company was such a corporation, in Beggs v. Edison Electric Light & Illuminating Co., 96 Ala. 295, 38 Am. St. Rep. 94, 11 So. 381, on page 383 of the latter, said:

"The word 'manufacture' means the making of anything by hand or artifice. [Louisville & N.] Railroad Co. v. Fulgham, 91 Ala. 555, 8 So. 803. Mr. Worcester's Dictionary defines 'manufacture' as 'the process of making anything by art, or of reducing materials into a form fit for use by the hand or by machinery.' The definition that the word is given by the Century Dictionary is as follows: 'The production of articles for use from raw or prepared materials by giving these materials new forms, qualities, properties, or combinations, whether by hand labor or by machinery.' According to the above definitions of the word 'manufacture,' we are constrained to consider and declare an electric light company a manufacturing corporation to all intents and purposes. It is no answer to this argument to say that electricity exists in a state in nature, and that a corporation engaged in the electric light business collects or gathers such electricity. This does not fully or exactly express the process by which such corporations are able to make, sell, and deliver something useful and valuable. The electricity that exists in nature is of a very different quality from that produced by means of machinery. The business in which an

electric light company is engaged makes it necessary to invest large capital in the plant; and there is purchased and consumed coal and other materials to produce steam in order to furnish the power for the operation of the machinery. Then there is supplied and operated a complicated system of machinery, like that commonly used in manufacturing establishments, such as boilers, engines, dynamos, shaftings, beltings, etc.; and then, by means of wires, cables, and lamps, the mysterious power generated by the machinery used from the materials furnished is transmitted, and lights the streets and private houses. But the electric currents that produce these results cannot be said to be 'the free gifts of nature, gathered from the air or the clouds.' It is the produce of capital and labor, and in this respect cannot be distinguished from ordinary manufacturing operations.''

In holding an electric light company was included within a general exemption of manufacturing companies from taxation, the New York court of appeals in People ex rel. Brush Electric Mfg. Co. v. Wemple, 129 N. Y. 543, 29 N. E. 808, on page 810, 14 L. R. A. 708, on page 711, said, in speaking of electricity:

''It is the product of capital and labor, and in this respect cannot be distinguished from ordinary manufacturing operations. According to the common understanding, the electricity or thing which produces the results from which the corporation derives its income is generated or produced by the application of power to machinery, and thus, by means of a process wholly artificial, the relator is enabled to sell the product of its operations to its customers.

''Passing by the refinements of scientific discussion as to the nature of electricity, it would seem to be common sense to hold that a corporation that does all this is in every just sense of the term a manufacturing corporation.''

Electricity generated for the purpose of furnishing light, heat, and power is a product of *manufacture*. In re Charles Town Light & Power Co., D. C. W. Va., 183 F. 160, affirmed in 4 Cir., 184 F. 986.

''A reasonable construction of the language used in the act of 1866 would recognize the generation of electricity as the

*manufacturing of electricity."* Pacific Gas & Electric Co. v. United States, 9 Cir., 45 F. 2d 708, 710. Review denied by United States Supreme Court, Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038.

The Maine court in Edison United Mfg. Co. v. Farmington Elect. Light & Power Co., 82 Me. 464, 19 A. 859, at page 860, said:

"The statute pronounces that a gas company, engaged in supplying a town with light, is doing a business involving public duties and obligations. Certainly an electric light company, performing the same general service that the gas-light company does, is as nearly like the latter company, in the sense implied by the statute, as two companies can be alike, unless both be gas-light companies. The two companies do the same kind of business, and perform the same service, only through somewhat different agencies. Each supplies a town with artificial light. *Each manufactures its power."*

In McMillan v. Noyes, 75 N. H. 258, 72 A. 759, 762, a legislative act to encourage the establishment of *factories* was held to include electric power companies. In Bates Machine Co. v. Trenton & N. B. R. Co., 70 N. J. L. 684, 58 A. 935, 103 Am. St. Rep. 811, the New Jersey court of errors and appeals held that the production and control of electric power by mechanical means and its adaptation for use upon a trolley system, was a *manufacturing purpose.* The Montana court in Chicago, M., St. P. & P. R. Co. v. Custer County, 96 Mont. 566, 32 P. 2d 8, held that electricity produced by machinery and labor is *manufactured.* See, also, State v. Hennessy Co., 71 Mont. 301, 230 P. 64, 66. A plant wherein electric power was generated held a *manufactory* within a tax exemption statute. Duke Power Co. v. Bell, 156 S. C. 299, 152 S. E. 865, 868. There was the same holding in Columbia Ry., Gas & Electric Co. v. Query et al., 134 S. C. 319, 132 S. E. 611. In Society, etc. v. City of Paterson, 88 N. J. L. 123, 96 A. 92, 93, the court said:

"That the production of electricity is a species of *manufacturing,* and therefore within the charter power of the prosecutor, seems to be abundantly supported by judicial decision, wherein kindred questions have presented the inquiry for determination."

In Empire Water & Power Co. v. Cascade Town Co., 8 Cir., 205 F. 123, an electric power company was classed as a manufacturing company. Machinery used in the generation of electricity was held to be taxable as being employed in *manufacture*. Boston & M. R. R. Co. v. Town of Billerica, 262 Mass. 439, 160 N. E. 419. In construing a constitutional exemption, a corporation organized for the purpose of generating electricity for distribution to the public was held to be a *manufacturing corporation*. Vencedor Inv. Co. v. Highland Canal & Power Co., 125 Minn. 20, 145 N. W. 611. See, also, Zamani v. Otter Tail Power Co., 182 Minn. 355, 234 N. W. 457, 458. "It is well settled that electricity made by artificial means is a product of *manufacture*." Hetherington v. Camp Bird Mining, Leasing & Power Co., 70 Colo. 531, 202 P. 1087, 1088. The Colorado court in Lamborn v. Bell, 18 Colo. 346, 32 P. 989, 990, 991, 20 L. R. A. 241, in holding that "milling" as used in the constitution was synonymous with manufacturing, and that an electric light plant is a *manufacturing establishment*, said:

" 'The counsel for appellant contended that making flour from wheat, reasoning from the etymology of the word, and the nature of the process, is not manufacturing. But whilst, from its derivation, the primary meaning of the word " manufacture" is making with the hand, this definition is too narrow for its present use. Its meaning has expanded as workmanship and art have advanced; so that now nearly all artificial products of human industry, nearly all such materials as have acquired changed conditions or new and specific combinations, whether from the direct action of the human hand, from chemical processes devised and directed by human skill, or by the employment of machinery, which, after all, is but a higher form of the simple implements with which the human hand fashioned its creations in ruder ages, are now commonly designated as "manufactured." ' "

The Pennsylvania court, in Commonwealth ex rel. McCormick v. Keystone Electric Light, Heat & Power Co., 193 Pa. 245, 44 A. 326, held the defendant to be a manufacturing company. In State ex rel. Spillman v. Interstate Power Co., 118 Neb. 756, 226 N. W. 427, the Nebraska court in holding that the defendant came within the purview of a section of the statute providing: "Any person, firm or company, association

or corporation * * * engaged in the production, manufacture or distribution of any commodity in general use'', Comp. St. Neb. 1922, §3432, said on page 433:

''Thus, in the language of everyday life and in the strictly commercial sense of the term, 'electricity' is 'produced', 'stored', 'measured', 'bought and sold'. It is moved or transported from place to place in containers or by cable. It is something that one trades or deals in. We buy it and pay for it and determine the amount of our purchases by definite and well-understood 'standard'. Brought into being as a product, it exists in modern life as a commodity. The conclusion is that, as a matter of strict definition, 'electricity' in the commercial sense of the term is not only included within the literal terms of the statutes on which the state relies, but is plainly within the reason and spirit of the enactments, and that the principles of the common law are not without application to the situation before us.''

While there are decisions that the generating of electricity is not manufacturing, the general rule is as stated in 26 Cyc. 522:

''The production of electricity by artificial means in a condition fit for use is generally held to be a manufacture, and the theory that it is merely the gathering of a gift of nature is disapproved.''

II. Section 8512-g6 provides that an association may be formed for a ''mechanical'' business. While we have no doubt that the generation of electricity is a manufacturing process, it is putting no undue strain upon the meaning of the term ''mechanical'', to say that it is also the product of a mechanical process. Most of us are familiar, in a general way, at least, with the equipment of electric power plants, and have observed the machinery and various mechanical instrumentalities and apparatus there used. It is our judgment that the generation of electric energy is a mechanical business. See Beggs v. Edison Electric Light & Illuminating Company; People ex rel. v. Wemple; In re Charles Town Light & Power Company, all cited herein, and Coast & Lakes Contracting Corporation v. Martin, 92 Conn. 11, 101 A. 502.

III. Relator has argued, at length, that article IV contains not one, but seven separate primary purposes. The appel-

lees, in the court below, and in this court, have contended that paragraphs two to seven, inclusive, of the article, were not, in fact, purposes, but were powers of the association. And further, that if they were purposes, they were but incidental to the single purpose, stated in paragraph one of article IV. The trial court held, that whether they were denominated powers or purposes, the matters contained therein were but incidental to or necessary to carry out the object for which the association was formed, as set out in paragraph one. We believe that is the reasonable and proper construction to place upon the entire article, taking into consideration its language, the evident object of the county cooperatives in organizing the Federated Cooperative, and the provisions of chapter 390-G1 of the Code.

While there is, ordinarily, a clear distinction between the powers and the purposes of a corporation, or an association of this kind, a reading of the provisions of chapter 390-G1, and of chapters 389 and 390 of the Code, discloses that the legislature has used the two terms interchangeably, and with reference to the same matters. For illustration, in chapter 389, entitled "Cooperative Associations", the "purposes" for which the associations may be formed are stated thus in section 8459:

"Any number of persons, not less than five, may associate themselves as a cooperative association, * * * for the *purpose* of conducting any agricultural, dairy, mercantile, mining, manufacturing or mechanical business on the cooperative plan."

While in section 8468 of the same chapter, the "powers" are set out as follows:

"An association created under this chapter shall have *power* to conduct any agricultural, dairy, mercantile, mining, manufacturing, or mechanical business, on the cooperative plan * * *".

Section 8512-g6 sets out for what an association may be formed, that is, its object, purpose, or business. Section 8512-g7 sets out the powers which each association may have. The first power specified is "to conduct any business enumerated in section 8512-g6 which its articles specify". In other words, the business or purpose of the association is treated as a power of the association. Further proof of this is shown in the additional provision in section 8512-g7 that "each association shall have

*power* to do *anything* permitted *anywhere* in this chapter''. It is also provided in said section that each association shall have *power* to exercise *any power, right,* or *privilege* suitable or necessary for, or incident to promoting or accomplishing any of its *"powers, purposes* or *activities* \* \* \*''.

No particularly different matters are indicated in the use of these three terms. That the matters noted in paragraphs two to seven, inclusive, are in fact powers is indicated by the fact that they are substantially a restatement of the powers stated in section 8512-g7. It is our judgment, therefore, that the last six paragraphs of article IV are not independent and primary purposes, but are merely powers of the association to be exercised in accomplishing the single purpose, object, or business of the association in the procuring and distribution of electric energy, as stated in paragraph one of the article, and that article IV, as a whole, and in none of its parts, is contrary to, or violative of, section 8512-g6 of the Code.

■ IV. The relator also urges that purchasing of electric energy as stated in paragraph one of article IV is the statement of a separate purpose or business. The right to purchase electric energy must be considered in connection with the whole object of the association, which is to furnish the county cooperatives, and their individual members, and also nonmembers, governmental bodies, municipalities, and other patrons, with an uninterrupted supply of electric current. If the association is to prosper as a business, and the patronage is to be retained, it is very necessary that it be ready and able to supply the service without interruption. Machinery does break down and casualties do occur. In such event good business management requires that the association have the right to secure a necessary supply of current from other sources. The right to purchase is therefore not a new business of the association, but it is simply a necessary adjunct to the business for which it was organized.

■ V. The relator also urges that the word ''or'' particularly has a disjunctive meaning, when it is used with word ''either'', since then an alternative is indicated. This may be conceded. In such a combination of ''either'' and ''or'' each is a correlative of the other. But as these two words are used in section 8512-g6, the ''or'' which is the correlative of ''either'' is the ''or'' immediately preceding subdivision 2 of the section, and not the ''or'' appearing in subdivision 1, as contended for

by the relator. We readily agree that the "or" in the first combination mentioned is used in a disjunctive sense. But the "or" as used in subdivision 1 may have a disjunctive or conjunctive meaning depending upon the circumstances. The relator agrees that the second "or", therein, has a conjunctive meaning. And if the business of the association is the operation of a telephone exchange, or the operation of an electric power plant, then each "or" in subsection 1 may, and properly should, be used in a conjunctive sense, because with either business, the construction and operation of the lines would be incidental and necessary adjuncts thereto. In fact, if an association were formed to conduct either of these businesses, the words "or to construct or operate telephone or electric transmission lines" could be eliminated from the subsection, since the right to use such lines would be implied as an essential to carrying on either of those businesses.

Inasmuch as it is our conclusion that the generation of electricity is included within subsection 1 of section 8512-g6, and that such authority necessarily carries with it the right to market the product in the only possible way, by transmission lines, the fact that the word "or" may be used in a disjunctive or conjunctive sense is wholly immaterial in this case.

It is a well-known rule of statutory construction that the courts will construe disjunctive words as conjunctive, and vice versa, and will disregard technical rules of grammar and punctuation, when necessary to arrive at the intent of the legislative body. Such rule has been uniformly followed by this and other courts. Chicago, R. I. & P. Ry. v. Rosenbaum 212 Iowa 227, 231 N. W. 646; Lahn v. Town of Primghar, 225 Iowa 686, 281 N. W. 214, 216, 217; In re Will of Petersen, 186 Iowa 75, 83, 86, 172 N. W. 206; 1 Fletcher on Corporations, sec. 117, page 201; People ex rel. Municipal Gas Co. v. Rice, 138 N. Y. 151, 33 N. E. 846.

VI. Rural electrification projects are being advocated generally in various parts of Iowa, and in other states. The federal government is aiding in the institution and the expansion of these projects. In this case it appears that the residents of five counties are engaged in this new endeavor. Their individual county associations and their organization of the Federated Cooperative were permissible under chapter 390-G1. This legislation should be liberally construed to effect its purpose

in its broadest scope. As stated by this court, in State v. Gibson, 189 Iowa 1212, 1220, 174 N. W. 34, 37:

"The courts must do nothing to prevent or embarrass ordinary legislation. The construction is to be liberal, and not critical or technical."

And as stated by Justice Hamilton in State v. City of Des Moines, 221 Iowa 642, 646, 266 N. W. 41, 43:

"In seeking to find the intent of the legislature, common sense and reason should prompt us to look for the object and purpose which the legislature had in mind and not to depend on dogmatic terms of expression." See, also, Bookhart v. Motor Co., 215 Iowa 8, 244 N. W. 721, 722, 82 A. L. R. 1359.

In 1 Fletcher on Corporations, 170, the rule is stated thus:

"Statutes providing the purposes for which corporations may be formed will be liberally construed to sustain the legality of corporations organized in good faith and for legitimate purposes." And on page 375: "A liberal construction will be adopted with regard to acts required to create a corporation, and every presumption is to be indulged in favor of its legal existence after it has gone into operation."

To the same effect see Watton v. Cruce, 44 Okla. 186, 143 P. 1152; Attorney General v. Belle Isle Co., 59 Mich. 157, 26 N. W. 311, 313; 60 Am. Rep. 287; 7 R. C. L. 50; Arkansas Cotton Grower's Cooperative Assn. v. Brown, 168 Ark. 504, 270 S. W. 946, 947, 1119; Liberty Warehouse Co. v. Burley Cooperative Assn., 276 U. S. 71, 94, 48 S. Ct. 291, 294, 296, 72 L. Ed. 473.

VII. The trial court held that the relator had no standing to bring this action, because of the provisions of sections 8512-g53 and 8512-g56. The reasons given appear sound, but we are not passing upon that question, because our other conclusions are decisive of the appeal.

Other matters have been argued but a decision of them is not necessary. (All italics herein are ours.) The judgment appealed from is affirmed.—Affirmed.

MITCHELL, C. J., and STIGER, HAMILTON, HALE, OLIVER, and MILLER, JJ., concur.