(No. 5271.   November 8, 1929.)

J. E. ARKOOSH et al., Plaintiffs; GEORGE E. CARTER, Commissioner of Reclamation of the State of Idaho, Defendant; and WM. BLACK et al., Cross-Defendants, Respondents, v. BIG WOOD CANAL COMPANY, a Corporation, Appellant.

[283 Pac. 522.]

384

Martin Silk, Cross-defendant, *pro se.*

Bissell & Bird, for Appellant.

James & Ryan, Hawley & Hawley, Adam B. Barclay, W. A. Brodhead, Frank Stephan, Attorney General, and Sullivan, Sullivan & Van Winkle, each for Certain Respondents.

GIVENS, J.—Respondents, owners and holders under what is known as the Frost decree, Dec. 13, 1909, adjudicating the waters of the Big Wood River (*Frost v. Alturas Water Co.*, 11 Ida. 294, 81 Pac. 996; *Frost v. Idaho Irr. Co.*, 19 Ida. 372, 114 Pac. 38) of different priorities antedating the storage rights of appellant, brought this action to enjoin appellant from interfering with the natural flow of Big Wood River and from interfering with the respondents' appropriated waters, respondents claiming the right to use the water whenever they deem it necessary in point of time and to compel appellant to make good to respondents out of appellant's stored waters, the deficiency in the claimed natural flow of the river caused by the construction of appellant's reservoir, resulting in loss to the respondents of their appropriated rights, and for costs.

■ Appellant moved to strike respondents' brief as not complying with rule 40 of this court. References in the brief to the transcript folios are too few. Propositions of law are not separately stated from the argument. The brief is principally only an answer to appellant's brief but it is of value and therefore will not be stricken.

■ Respondents all have an interest, though not an equal interest, in the waters of the stream and the extent of the flow thereof; hence there was no misjoinder of parties and the demurrer on that ground was properly overruled. (*Frost v. Alturas Water Co., supra;* see, also, *Independent Irr. Co. v. Baldwin*, 43 Ida. 371, 252 Pac. 489.)

This is not an action at law but a suit in equity to restrain the interference by appellant with respondents' claimed prior appropriations. Thus it is clearly distinguishable from *Creer v. Bancroft Land Co.*, 13 Ida. 407, 415, 90 Pac. 228, 231, as the court therein said:

"It appears to us that this is a very different suit from an ordinary water suit. In a water suit, an appropriator from a certain stream would have to bring an action against

each and every other appropriator from the same stream before he could have his rights finally adjudicated as to all of such appropriators. His bringing a suit against one appropriator would not settle his rights; it would leave him with other litigation to settle them, and for that reason he is permitted to join as plaintiff or defendant every other appropriator of water from the stream. This is a very different suit—there is no issue raised as to the priority of the rights of these plaintiffs. As before stated, the only question presented by each of the plaintiffs is: How much water is necessary to properly irrigate his land? After that has been determined, if a deficiency or shortage of water should occur, then the appellant would be required to distribute to each party his *pro rata* share of the water based on the amount it took to properly irrigate his land as determined by the court.''

The action of the trial court in sustaining the motion for nonsuit as against appellant's cross-complaint is disposed of by the consideration herein of the main issues.

The appellant is the operating company under the control of the settlers and as such the successor to a construction Carey Act Irrigation Company.

Appellant's reservoir was constructed about 1910, primarily to conserve the flood waters of the Big Wood River. But in addition to its storage rights, appellant has acquired certain natural flow rights determined in the Frost decree. Otherwise the storage rights are later than the rights of respondents.

The Big Wood River flows through a lava formation in which are found huge cracks and crevices. Before the construction of the reservoir, these crevices were kept filled, to a great extent, by the silt carried down by the natural flow of the river. The dam, however, tended to precipitate the silt behind it and between 1910 and 1920 the cracks grew larger and there was a gradual increase in the stream losses.

Until 1920 some of the natural flow of the stream was permitted to pass through the reservoir during the winter months of nonirrigating season. In that year, however, the

entire natural flow was impounded during the nonirrigating season, until May 17 at which time it was suddenly released and the force of the great head of water, as it swept down the stream, washed away most of the silt and debris out of the crevices of the channel, greatly increasing the stream losses.

The normal loss of the stream was about sixty cubic feet per second of time. After 1920, the losses increased rapidly until in 1924 the loss in the first section of the river was 213 cubic feet per second and in the second section 137 cubic feet.

These increased losses were at first assumed by appellant. That is, it turned down the stream from its storage waters, during the irrigation season, in addition to the normal flow of the stream, enough extra water to compensate respondents for the heavier losses; in 1925, however, this policy changed and this excess loss was charged against the normal flow of the stream. In other words, the decreed rights of respondents thenceforth were cut down to the extent of the increased losses.

As stipulated by the parties, there are three issues: First, the determination of the beginning and end of the irrigation season; secondly, respondents' rights to the flow of the river during the nonirrigation season for domestic and stock purposes; thirdly, the determination of the losses in the flow of the river and the responsibility of the Big Wood Canal Company therefor.

The trial court found that 60.6 cubic feet was the normal natural loss of the river; that the appellant and its predecessors in interest were responsible for all losses above that figure; that such losses should be borne by appellant's stored water; and that the respondents were entitled to have the water flow to their headgates whenever they desired it, thus in effect, holding that they were entitled to the use of their appropriated waters for stock and domestic purposes during the nonirrigation season.

Appellant contends that respondents' cause of action, if any, is for damages, not by way of injunction, relying on,

among other authorities, *Bailey v. Idaho Irr. Co.,* 39 Ida.
354, 227. Pac. 1055. That action was for damages occasioned
by interference with a water right and the opinion quotes
Kinney on Water Rights to the effect that an action for dam-
ages lies under such circumstances. The text of Kinney
shows that such action is not exclusive and that there may be
an action to restrain continued interference with rights by
injunction. Such remedy is discussed in chap. 81, the
author there indicating that the protection of rights is
treated of, first, under injunction and second, by suit for
damages. Chapter 81 is devoted to the sections on injunc-
tive relief, and chapter 83 to damages, where occur the sec-
tions cited in *Bailey v. Idaho Irr. Co., supra.*

Appellant urges that no negligence was proven. The in-
terference by appellant with respondents' water rights,
though not negligent, furnishes justification for injunctive
relief.

Appellant contends that since the damage was caused
by appellant's predecessor in interest, appellant may not be
made to respond in damages, not being the originator of the
injury or a joint tort-feasor. This is not an action for dam-
ages but for injunctive relief against continued interference
by appellant with respondents' water rights. We may con-
cede that the management and control of the reservoir did
not rest in appellant during the season of 1920. But the
injury of which respondents complain embraces more than
the losses suffered in 1920. It is a continuing injury, for
which appellant is presently responsible. Appellant may
therefore be enjoined from further continuing such injury.

Covering the season of 1920, the report of the Wood River
water-master, introduced in evidence, was, in part, as fol-
lows:

"1920 Distribution.

"The custom during past years on Big Wood River has
been to allow a quantity of water to flow down the channel
during the non-irrigation period to satisfy domestic and
culinary demands below the reservoir. During the fall and
winter of 1919–1920, 23,000 acre feet of water was wasted

in this manner. On the 22nd of March, 1920, the gates of the Magic Reservoir were closed. During the month of February and the early part of March, heads of water at intervals of every few days were allowed to flow from the Reservoir to fill potholes in the channel of the river.

"By April 1st, 12,000 acre feet of water had collected in the Magic Reservoir. Starting with the first of April 55 second feet of the inflow into the reservoir was credited to the Idaho Irrigation Co. to compensate the Co. for the use of the reservoir by the decreed priority users. The remaining inflow was divided between the priority rights owned by the Idaho Irrigation Co. and the rights owned by others.

"The decreed priority owners above the reservoir were contemplating the use of large quantities of water during the early part of the irrigation season. An agreement, however, was entered into with them to allow all the flow of Big Wood River to flow into the reservoir until the 15th of May and for this concession their rights were not to be cut off later to supply prior rights below the reservoir.

"Below the reservoir the deliveries were made periodically, on May 17th the gates of the Magic Reservoir were raised and kept open until June 4th. Another run was made during the period from June 10th to 27th. A run was started on July 5th for the decreed priority rights and continued until July the 21st. The last few days of this run the water was diverted into the Richfield and North Gooding Canals to furnish a domestic run for the Carey Act project.

"On behalf of the water users under the Carey Act project the upper Big Wood River decree priority owners allowed their water to be cut off on the evening of June 4th and was not turned back on until the morning of June 7th, this arrangement yielded approximately 1800 acre feet of water.

"The benefits of the storage arrangement for all parties concerned was very great. The decreed priority owners on lower Big Wood River other than those owned by the Idaho Irrigation Co. and the Cotton Wood Canal Co., received 16,000 acre feet in 1919 and 16,315 acre feet in 1920, the

delivery per acre was 1.95 acre feet in 1919 and 1.88 acre feet in 1920. (See chart No. 11.)

"Under the rotation system of 1920 a much greater crop yield resulted with a less quantity of water.

"Had the continuous flow system been in operation with the heavy channel losses that occurred during the season of 1920 the Idaho Irrigation Co. would have received only 24,300 acre feet of water which includes the 12,000 acre feet in the reservoir on April 1st, while 50,548 acre feet was actually diverted into their canals for their use from Big Wood River.

"21,559 acre feet was delivered to others than the Idaho Irrigation Co. below the reservoir from the waters of Big Wood River, while by the direct flow method the amount would have been but 14,200 acre feet.

"The benefits received by the decreed priority owners above the reservoir were very great. They received during the months of June and July 14,600 acre feet in excess of what they would have been entitled to receive under the continuous flow method.

"The season of 1920 yielded the smallest quantity of water of any season since records have been kept. The average yearly inflow into the Magic Reservoir for the past 12 years has been 419,000 acre feet while the flow for the year ending September 30th, 1920, was only 125,000 acre feet.

"The spirit of cooperation that existed among the water interests of Big Wood River resulted in a very great benefit to all parties concerned.

"On Silver Creek and Lower Little Wood River the decreed priority users received in 1919, 39,000 acre feet and in 1920, 40,000 acre feet, the users above Richfield received 22,370 acre feet, in 1919 and 20,800 acre feet in 1920.

"At the time of the year when the greatest demand for water existed the stream was practically dried up at Richfield by the diverting of excessive quantities of water above Richfield, and resulting in great damage to the lower users. In 1919 at the time of greatest demand the water was available while in 1920 such was not the case and with a greater

consumption of water less crops were produced. In 1919 at the time of peak demand the Carey Act water was in the channel and the return flow was considerable while in 1920 such was not the case. This condition with improper distribution above Richfield gave rise to all the hard feelings that existed with the lower water users."

Conceding that the method followed that year was an effective co-operative solution of some of the difficulties, so evidently connected with the water situation of the respective parties herein, it does not establish, nor does the evidence show, that respondents consented to appellant's actions over a period of years resulting in loss to respondents of their water so as to prevent them from maintaining this action.

The findings in the Frost decree, dated December 13, 1909, as to water for domestic and other uses were as follows:

"That for the irrigation of their respective tracts of land, and for domestic and other purposes, the said claimants and their predecessors in interest appropriated, on the respective dates set opposite their names, of the waters of the Malad or Big Wood River, or its tributaries, the respective amounts of water set opposite each name, and at the respective times, as follows: to wit."

The findings then enumerated the different appropriators, the amount of water to which each was entitled and the date of priority, the source of supply, that is, Wood River or a tributary thereof. The decree provided:

"It is ordered, adjudged and decreed that the several parties, plaintiffs and defendants herein named, do have judgment respectively or a right to use, for irrigation and other purposes the following number of inches of water, each fifty inches thereof to be equivalent to a flow of one cubic foot per second, as prescribed by the law of Idaho, from the waters of the Malad or Big Wood River and its tributaries, situated in the counties of Blaine and Lincoln, State of Idaho, their priorities to date from the times hereinafter named, to wit."

Thus no separate or specific amount was designated for domestic use as distinguished from uses for irrigation. Nor was there such a specific designation in the findings, conclusions or decree herein.

Conceding that under the Frost decree, respondents were entitled to water for domestic use, the amount and extent of their appropriations for that purpose were not herein proven nor did the evidence show any such use of the waters of the river other than the use of water for such purposes from so-called pot-holes which does not authorize injunctive relief as against interference with appropriated rights. (*Hutchinson v. Watson Slough Ditch Co.*, 16 Ida. 484, 133 Am. St. 125, 101 Pac. 1059.)

Complaint is made that, by the decree appealed from the respondents were given the exclusive right to determine the time when water may be beneficially applied. The water user is acquainted wtih his land and his crops and should be in better position to determine when water should be applied than any other person. Various provisions of our statutes recognize his right to demand water. The respondents are entitled to apply water to their lands for the purpose of irrigation as early as it may be beneficially applied. Under neither the statutes nor the Frost decree are they entitled to water when it cannot be so used. Under the provisions of the decree in this case respondents appear to have the right to demand water for the purpose of irrigation at any time during the entire year when the same can be applied to a beneficial use. By the terms of the decree herein, respondents are made "the judges of the times when" the water can be used and if the decree remains as entered their right to receive water at any time they may demand it is a matter finally adjudicated. We have concluded that the decree is in this respect too broad. Our present statutes give the commissioner of reclamation the "immediate direction and control of the distribution of water from all of the streams to the canals and ditches diverting therefrom" (C. S., sec. 5606). We are of the opinion that the matter should be determined by that department. The

water-masters who represent the commissioner in the actual distribution of water may, under the provisions of C. S., sec. 5612 (Laws 1927, 80) be called into service upon the application of three or more water users. The action of the commissioner in determining when water may be first beneficially used and in delivering or refusing to deliver water may be reviewed and controlled in such manner as the facts may require by appropriate action by any party deeming himself aggrieved.

■ We believe that a proper interpretation of the Frost decree and determination of the rights of the parties to this action is that appellant's storage rights may only be exercised so long as respondents have at their headgates the amount of water to which they are entitled under their appropriations as the same would have naturally flowed in the natural stream prior to the construction by appellant and its predecessors in interest of their irrigation system.

■ The principal question presented for consideration involves the responsibility of the Big Wood Canal Company for the losses in the river flow due to the construction of its reservoir. We believe that if by the construction of its dam, and its use of the natural channel of the river, appellant has interfered with respondents' rights, and by such use, unless restrained, will continue to interfere with respondents' rights and deprive them of water to which they are entitled by reason of their prior appropriation, such action is wrongful and may be enjoined. (*Larimer County Reservoir Co. v. People*, 8 Colo. 614, 9 Pac. 794; Wiel on Water Rights, 2d ed., sec. 6162; 3d ed., secs. 278, 279; 26 Cal. Jur., sec. 353, p. 149; Kinney on Water Rights, chap. 81.)

It is not a question of respondents' rights to the river-bed as such but a question of respondents' rights to a certain amount of water which they are entitled to have flow to their headgates.

In *Bennett v. Nourse*, 22 Ida. 249, 125 Pac. 1038, 1039, the court said:

"A subsequent appropriator has a vested right as against his senior to insist upon a continuance of the conditions that existed at the time he made his appropriation, provided a change would injure the subsequent appropriator."

*Schodde v. Twin Falls Land & Water Co.*, 224 U. S. 107, 32 Sup. Ct. 470, 56 L. ed. 686, is clearly distinguishable because therein the interference was not with the water right but with the current. In other words, the same amount of water went to Schodde's place as before. Here it is charged that the waters to which the respondents are entitled are not available and have been entirely lost and diverted and the court so found. Respondents ask that appellant be required to make good their loss out of its stored water. As indicated above this is an action for an injunction to restrain appellant from interfering with respondents' water rights and is not an action for damages. To require appellant to thus make good the losses would be, in effect, to require appellant to respond in damages, supplying water instead of money, or to restrict appellant in the manner in which it must refrain from interfering with respondents' rights.

We do not believe that this part of the decree can be sustained. While appellant can be restrained from interfering with respondents' water rights, the methods adopted by appellant to attain such result cannot be so restricted.

From what has been said it necessarily follows that the decision must be reversed and the cause remanded, with instructions to the trial court to enter a decree in accordance herewith.

Costs awarded to appellant.

Wm. E. Lee and Varian, JJ., and Baker, D. J., concur.

ON REHEARING.

(January 11, 1930.)

BAKER, District Judge.—Respondents Hans Sorenson and Merl C. Sorenson asked for a rehearing, contending that the original opinion herein denied them their appropriation of water for domestic use during the nonirrigation season granted by the Frost decree.

We believe that a proper interpretation of the Frost decree is that while it awarded to respondents and their predecessors a right to use, during the irrigation season, a particular quantity of water for irrigation and allied purposes, it was too indefinite and uncertain to award to them another or separate and distinct right to use water for any purpose during the nonirrigation season, or for a purpose not directly connected with irrigation (*Lee v. Hanford*, 21 Ida. 327; 121 Pac. 558; *Reno v. Richards*, 32 Ida. 1, 178 Pac. 81; *Walsh v. Wallace*, 26 Nev. 299, 99 Am. St. 692, 67 Pac. 914; *Smith v. Phillips*, 6 Utah, 376, 23 Pac. 932; *Nephi Irr. Co. v. Vickers*, 15 Utah, 374, 49 Pac. 301; *Rogers v. Overacker*, 4 Cal. App. 333, 87 Pac. 1107; *Powers v. Perry*, 12 Cal. App. 77, 106 Pac. 595; Long on Irrigation, p. 394); that the right of respondents to a flow of water for domestic use alone is a right not adjudicated by that decree or by the decree in this suit, but that such right to a flow for domestic use alone, during the nonirrigation season, is left for later determination in an appropriate proceeding; that, as against any right of respondents fixed by the Frost decree, appellant's storage rights may be exercised so long as respondents have at their headgates, during the irrigation season, the amount of water to which they are entitled under their appropriations as the same would have naturally flowed in the natural stream prior to the construction, by appellant and its predecessors in interest, of their irrigation system.

Givens, C. J., and Wm. E. Lee and Varian, JJ., concur.

Budge, J., finding himself disqualified, did not participate.