## No. 27714

**In Re Question Submitted by the United States Court of Claims in its Proceeding No. 105-75 Entitled A-B Cattle Company, et al., v. United States of America**

(589 P.2d 57)

Decided December 13, 1978.                    Rehearing denied January 29, 1979.

Leo S. Altman, for plaintiff, The Bessemer Irrigating Ditch Company.

Saunders, Snyder, Ross & Dickson, Glenn G. Saunders, John M. Dickson, for all plaintiffs except The Bessemer Irrigating Ditch Company.

James W. Moorman, Assistant U.S. Attorney General, Hank Meshorer, Trial Attorney, Department of Justice, Donald W. Redd, Attorney, Department of Justice, John R. Little, Jr., Regional Solicitor, Ralph Canaday, Attorney, Office of the Solicitor; J. D. MacFarland, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, Gregory J. Hobbs, Jr., First Assistant, James E. Thompson, Assistant, for amicus curiae, State of Colorado.

Fairfield and Woods, Charles J. Beise, Howard Holme, for amicus curiae, Southeastern Colorado Water Conservancy District.

Maynes & Anesi, Frank E. Maynes, for amicus curiae, Southwestern Colorado Water Conservancy District.

Delaney & Balcomb, Kenneth Balcomb, for amicus curiae, Colorado River Water Conservation District.

Ireland, Stapleton, Pryor and Holmes, D. Monte Pascoe, for amicus curiae, Lower South Platte Water Conservancy District.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

Upon rehearing, this is our response to a question certified to us by The United States Court of Claims in its case No. 105-75 pursuant to C.A.R. 21.1. The question so certified is:

"Under Colorado law, does the owner of a decreed water right to divert and use water from a natural stream have a right to receive water of such quality and condition, *including the silt content thereof,* as has historically been received under that right?" (emphasis added)

In the light of the emphasized portion of the question and the posture in which we perceive the question was certified to us, our answer to the question is "No."

■ The parties stipulated that the Court of Claims should submit the interrogatory in the above form. It poses a question of rights to the quality and condition of water quite generally. It appears, however, that the issues before the Court of Claims in this connection are limited to silt presence. We, therefore, have distilled the question which we answer in the negative so that it reads as follows:

Under Colorado law, does the owner of a decreed water right to divert and use water from a natural stream have a right to receive the silt content thereof as has historically been received?

With the question, the Court of Claims submitted a statement of facts relating to the case before it, together with copies of pleadings, orders and other background information in the case. At oral argument on rehearing on October 23, 1978, this court permitted the filing of a May 1977 report of Norman K. Whittlesey entitled *"Irrigation Development Potential in Colorado."*[1] In addition, some amplification of the facts is contained in the briefs. As to the facts, we confine ourselves to the statement thereof submitted by the Court of Claims and the Whittlesey report.

The plaintiffs in the proceeding commenced in the Court of Claims are The Bessemer Irrigating Ditch Company (a mutual ditch company here referred to as the Bessemer Co.) and its 956 stockholders. The suit was filed pursuant to 28 U.S.C. § 1491, claiming entitlement to an award of just compensation from the United States for the taking of the alleged property right of the plaintiffs to turbid, silt-laden water and the substitution of clear water therefor.

The Bessemer Co. operates the Bessemer Ditch. Prior to the construction of the Pueblo Reservoir, the headgate of the ditch was on the Arkansas River a few miles west of Pueblo, Colorado. The ditch proceeds in a generally easterly direction through Pueblo and a suburban area east of Pueblo, and reaches into an agricultural area. The main Bessemer Ditch is now about 35 miles long. In addition, there are 174 miles of laterals.

The ditch has decreed water rights totalling 392 cubic feet per second of time (c.f.s.), 70 of which have priority dates earlier than 1882. The remaining 322 c.f.s. have an 1887 priority date. About 400 stockholders,

---

[1] This report was addressed to the Department of Natural Resources, State of Colorado, and was prepared under the auspices of the Environmental Resources Center of Colorado State University.

holding less than 3% of the stock, use the water for the irrigation of lawns, trees, shrubs and gardens in connection with their homes located in the Pueblo area. About 12% of the stock is used in the irrigation of truck gardens. The remainder of the stock is used in the irrigation of over 15,000 farm acres.

As a part of the Fryingpan-Arkansas Reclamation Project, the United States constructed Pueblo Dam across the Arkansas River a few miles west of Pueblo, creating Pueblo Reservoir. This inundated the headgate and first four miles of the Bessemer Ditch. In exchange for the water formerly transported from the headgate through the ditch, clear water is delivered from the dam into the ditch.

Prior to construction of the reservoir, the United States brought a condemnation proceeding in the United States District Court for the District of Colorado against the Bessemer Co. for the taking of the headgate and the upper portion of the ditch. The complaint in condemnation named the designated acreage, the Bessemer Co. and "Unknown Owners" as defendants. The Bessemer Co. answered, alleging among other things, that the delivery of clear water instead of silty water would result in substantial damage to the individual stockholders. Subsequently, these shareholders brought the action in the Court of Claims, asking for damages of nearly $100,000,000, plus costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees. Thereafter, the United States District Court in the condemnation proceeding sustained the Government's motion to dismiss the action as to the silt issue without prejudice to determination of that question by the Court of Claims.

The Court of Claims in its statement of facts has given as the basis for the alleged damages the following:

"The substitution of clear water from Pueblo Dam for the stream water with silt as diverted from the river has had certain adverse effects on the Bessemer Ditch system and the lands irrigated from the ditch. The silt in the water tended to seal the bed and banks of the ditch. Clear water leaks through the bottom and sides of the ditch in greater volume than silty water. More of the water passing the Bessemer Ditch gauging station about six miles below the original diversion point of the ditch seeps out of the bottom and sides of the ditch so that less of the diverted water reaches the points of delivery to Plaintiffs. There is an increase in the amount of aquatic vegetation growing in the ditch and the laterals. There has been an increase in erosion of the ditch and the laterals in places and sloughing off of material from the sides of the ditches into the bottom. There has been more seepage from the ditch into basements through the Pueblo reach of the ditch. When applied to land for irrigation, clear water does not spread as far as silty water."

## I.

The plaintiffs do not challenge the right of a junior appropriator to substitute water for their senior rights. See section 37-80-120, C.R.S. 1973. Rather, their position is predicated upon subsection (3) of the statute just cited, which reads, "Any substituted water shall be of a quality and continuity to meet the requirements of use to which the senior appropriation has normally been put." They state that the clear water lacks the beneficial qualities found in silty water and will not spread as far as silty water. They further argue:

"In substituting water of a quality which is not as useful to Plaintiffs as the natural stream water customarily diverted by Bessemer ditch from the Arkansas River, the United States has taken a part of the Plaintiffs' right to make beneficial application of their water."

■  This leads us to the fundamental question as to whether the original appropriations for the Bessemer Ditch were for silty water. In our view the appropriations were for water, and not for water containing silt. Silt is not a component of water. Rather, it is suspended sediment which comes principally from the banks and bottom of an onrushing stream and which settles to the bottom when there is no longer movement of the water. Thus, there is far more sediment being carried in the waters of the Arkansas River during the flood season of late spring, than in the early spring or fall.

■  The "quality" requirement of the statute is not violated when a person slows down the movement of water, resulting in the settling of silt to the bottom and leaving only clear water for the senior appropriator.[2] Further, we regard the storage of water, with consequent settling of silt to the bottom of the reservoir, as not constituting an unreasonable deterioration in quality. *See Cushman v. Highland Ditch Co.,* 3 Colo. App. 437, 33 P. 344 (1893).

## II.

There has not been cited any case holding that a senior appropriator has a vested right to the silt content of the water as of the time of his appropriation or at any other time. The cases cited by the plaintiffs basically fall into two categories: (1) where the appropriation of the junior appropriator reduced the amount of water available at the senior appropriator's point of diversion, causing the senior appropriator to receive less than he would have otherwise; and (2) where the water of the senior appropriator

---

[2] This is in contrast to the situation in *Arkoosh v. Big Wood Canal Co.,* 48 Idaho 383, 283 P. 522 (1929). There silt content in the stream reduced seepage losses through porous streambed material. A reservoir was constructed. The flushing action of the water released from the reservoir caused an increase in seepage losses, to the end that the quantity of water reaching downstream appropriators was lessened. *Arkoosh* is a *quantity* — not a *quality* — case. In this case there is no contention that the plaintiffs are not receiving the quantity of water entering the Bessemer Ditch to which they are entitled.

has been rendered unfit for the purpose of his appropriation by the addition of pollutants or other materials to the water. The trend and philosophy of Colorado law are contrary to the result asked by the plaintiffs. The Arkansas River is overappropriated; water is scarce; and conservation of water and prevention of wastage is the order of the day.[3] The plaintiffs have canals and laterals which leak and seep, thereby, so far as plaintiffs are concerned, wasting the water. They seek to continue their transport of water in leaky ditches by, in effect, calling upon the junior appropriators on the stream to pay for the portion of the leakage which silt will stop.

We said in *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968):

"For nearly a century the waters of the Arkansas River have been used and reused many times over as they proceed from elevations exceeding 12,000 feet to 3,375 feet at the state line. These uses, and similar uses on other rivers, have developed under article XVI, section 6 of the Colorado constitution which contains *inter alia* two provisions:

'The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using water for the same purpose;'

Under those provisions and the statutes enacted thereunder a great body of law has been established. In the six briefs, all ably written, sixty Colorado cases have been cited. These decisions are concerned primarily with the respective priorities of *vested rights* which have been established. It is implicit in these constitutional provisions that, along with *vested rights,* there shall be *maximum utilization* of the water of this state. As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights.* We have known for a long time that the doctrine was lurking in the backstage shadows as a result of the accepted, though oft violated, principle that the right to water does not give the right to waste it.

"*Colorado Springs v. Bender,* 148 Colo. 458, 366 P.2d 552, might be called the signal that the curtain was about to rise. There it was stated as follows:

'At his own point of diversion on a natural water course, each diverter must establish some reasonable means of effectuating his diversion. He is not entitled to command the whole or a substantial flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled. *Schodde v. Twin Falls Land & Water Co.,* 224 U.S. 107, 119, 32 S.C. 470, 56 L.Ed. 686.'"

---

[3] *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968).

■ Our answer in the negative to the question propounded by the Court of Claims is a part of the policy of this state that there should be maximum utilization of water and that the maximum utilization doctrine be integrated into the law of vested rights. Without the storage of water, the use thereof cannot be maximized.

It will be noted that in *Colorado Springs v. Bender, supra,* this court cited the United States Supreme Court in *Schodde v. Twin Falls Land & Water Co., supra.* Schodde diverted his water from a shallow canyon and up to his fields by means of water-driven water wheels. Later, others built a dam which slowed the flow until it would not drive the water wheels. Schodde claimed damages against the defendant dam builder. The United States District Court dismissed the complaint on the ground that Schodde's claim to the right to have his water wheels turn was not a reasonable attribute of an appropriation. The Court of Appeals affirmed, as did the United States Supreme Court, stating, "extent of beneficial use was an inherent and necessary limitation upon the right to appropriate." *See Empire Water and Power Co. v. Cascade Town Co.,* 205 F. 123 (8th Cir. 1913).

■ In using its leaky ditches the Bessemer Co. has not attempted to make maximum utilization of the water. As was indicated in 1909 in a case involving the Bessemer Co. and its main canal (*Middelkamp v. Bessemer Irrigating Ditch Co.,* 46 Colo. 102, 103 P. 280), the time may not yet have arrived when all ditches can be required to be lined or placed in pipes. Even assuming that that proposition of 1909 still holds true, this does not change our view that the plaintiffs do not have the right to use silt content to help seal leaky ditches. To view it otherwise would run contra to a basic principle of western irrigation that conservation and maximum usage demand the storage of water in times of plenty for the use in times of drought.

### III.

■ The fountain of Colorado water law is to be found in *Colo. Const.* Art. XVI, § 5 which provides:

"The *water* of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be *property* of the public, and the same is dedicated to the use of the people of the state, *subject to appropriation* as hereinafter provided." (emphasis added)

Thus, our constitution makes *water* — not silt and not silt and water — the *property* which is subject to appropriation. Words used in the constitution are to be given "the natural and popular meaning in which the words are usually understood by the people who have adopted them." *Prior v. Noland,* 68 Colo. 263 at 267, 188 P. 729 (1920). To the same effect, *see People ex rel. Seeley v. May,* 9 Colo. 80, 10 P. 641 (1885).

Perhaps we need to look no further than this constitutional provision for our answer to the question propounded.[4]

The effect of granting any particular appropriator a constitutionally-protected property right in the concentration of silt present in the water at the time of the appropriation would seriously inhibit any subsequent upstream or downstream appropriation. Upstream diversions or impoundments will result in alteration of the silt concentration to downstream users if only due to the slowing impact on stream velocity. Applied in its extreme, an appropriator located on lower reaches of a stream with a very early appropriation date could put a call on the river for the receipt of its natural silt concentration, which would have the practical effect of halting all upstream use and commanding substantially the entire stream flow to satisfy its appropriation.

The Government and amici argue that the Bessemer Co. cannot establish a right in silt because silt is a pollutant under the provisions of the Colorado Water Quality Act (section 25-8-101 et seq., C.R.S. 1973) and the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.). The plaintiffs state, "this is not now, and never has been a pollution case," and they argue that, therefore, the last mentioned statutes do not apply. Our views already expressed are such that we do not need to reach these issues. For the same reason, we do not consider the question of who owns the silt, nor the Government's argument that the advantages inuring to the plaintiffs as a result of the construction and operation of Pueblo Reservoir exceed the disadvantages.

The Whittlesey report was tendered to show that in certain areas the lining of ditches reduces water entering the aquifer from leaky ditches. This relates to the balancing of cost of lining ditches with loss of well water pumped from the aquifer. We do not regard the report as applicable to the subject here, i.e., the alleged right to suspended silt.

The question certified is answered in the negative.

MR. JUSTICE LEE, MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN dissent.


MR. JUSTICE ERICKSON dissenting:

I respectfully dissent. Following a rehearing, Mr. Justice Kelley cast his vote in support of the opinion authored by Mr. Justice Groves, causing what was previously the majority opinion of this court to become the dissent. The majority opinion, by distilling the question certified to us, has, in my opinion, avoided the issue relating to the quality and condition of

---

[4] For a case involving the lack of right to appropriate salt as a part of water appropriated, see Deseret Livestock Co. v. State, 110 Utah 239, 171 P.2d 401 (1946).

water which has been appropriated and put to beneficial use. I sincerely hope that this court will reconsider this issue in future years.

The United States Court of Claims certified the following question to this court, pursuant to C.A.R. 21.1:

"Under Colorado law, does the owner of a decreed water right to divert and use water from a natural stream have a right to receive water of such quality and condition, including the silt content thereof, as has historically been received under that right?"

I would answer the question with a qualified "yes." Qualifications are necessary because water quality on a historic basis cannot be determined with certainty.[1]

Water quality, as it relates to the silt in the water, varies as stream or river conditions change during the seasons of the year, as well as with the quantity and velocity of water in the stream that is received by the owners of decreed water rights. The quality and condition of water is not constant and unvarying at all times after an appropriation is made. The owner of a decreed right has the right to receive water of a quality and condition, including the silt content thereof, that has historically been received, subject to variations in water quality caused by natural changes in the stream. The loss of the beneficial use of appropriated water, if the change is created by other users, constitutes a taking of property rights acquired by a prior appropriator. Similarly, a change in quality or condition caused by or resulting from structures or works constructed by other users which affects the beneficial use of water by prior appropriators impairs the property rights acquired by appropriation. A balancing of interest is required in every case to determine whether the change in quality or condition is within a reasonable range of acceptability for a prior appropriator when related to his beneficial use. The assignment of rights according to mechanically applied precepts and fixed definitions does not provide a balance which will ensure maximum utilization of our limited water resources.

The stipulated set of facts provides a foundation for the certified question which we have been called upon to answer. Issues relating to the value of the property taken, damages to the remainder and the offsetting benefits are not before us and necessarily should be resolved, in my opinion, by the Court of Claims.

---

[1] The certified question does not present, and neither the majority nor the dissent addresses problems which may be posed by the Federal Water Pollution Control Act, 33 U.S.C. 1251 *et seq.*, or the Colorado Water Control Act, § 25-8-101 *et seq.*, C.R.S. 1973, or other legislative acts related to water quality. We express no opinion whether an appropriator's right to receive water containing the natural silt historically received under a decreed water right conflicts with the directives of either state or federal statutes. The question whether such a right exists is independent of the question whether that right has been subordinated by those acts. *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).

On June 11, 1969, the United States initiated a condemnation action in the United States District Court for the District of Colorado as part of the Fryingpan-Arkansas Reclamation Project. The condemnation action was necessary to obtain property located on the proposed site of the Pueblo Reservoir. Included in the property condemned was the headgate and the upper 5.3 miles of the Bessemer Ditch.

In its answer in the condemnation action, the Bessemer Irrigating Ditch Company alleged that its stockholders would be injured not only by the proposed taking of its headgate and upper portion, but also by the proposed delivery of clear reservoir water in place of water containing the naturally-occurring silt in the water received under plaintiff's decreed right. The company's stockholders subsequently brought an action, pursuant to 28 U.S.C. § 1491, in the Court of Claims, seeking damages for the alleged taking of their property right in the natural quality of the water provided under their decreed right. Thereafter, the United States District Court for the District of Colorado granted the government's motion to dismiss the action concerning the silt issue without prejudice to determination by the Court of Claims.[2]

The parties to the proceeding in the Court of Claims subsequently stipulated that the Court of Claims certify the question in the above form to this court. The Court of Claims complied and also submitted a detailed statement of the facts, the most pertinent of which follow:
"9.   Since the construction of the Pueblo Reservoir, there has been a change in the quality of water taken by the Bessemer Ditch. Pueblo Reservoir acts as a large settling basin. The silt content of the Arkansas River water settles to the bottom of Pueblo Reservoir at its upper end. Deliveries of water through Pueblo Dam to the Bessemer Ditch commenced about February 25, 1974 and are clear water containing essentially no silt. Deliveries are accomplished through a pipe and valve arrangement in the dam structure to the undisturbed remaining part of the ditch. The United States has not obtained a decree from the Colorado Water Court or any Federal Court authorizing it to impound in Pueblo Reservoir any water attributable to Bessemer water rights, to deliver clear water to Bessemer Ditch in substitution for river water or otherwise to interfere with the Bessemer water rights.

---

[2] In an order dated May 8, 1973, Judge Arraj of the United States District Court for the District of Colorado discussed the merits of the issue presently before us and concluded that the plaintiffs were entitled to present evidence of the alleged taking. The court modified its May 8 order on September 20, 1973, because of jurisdictional obstacles which the court felt prevented it from entertaining the compensation claims. The court, nonetheless, stated that the government should pay for damages caused by the taking. Finally, on June 18, 1976, Judge Arraj determined that his earlier rulings were rendered "inappropriate" by the action filed in the Court of Claims. The court, therefore, dismissed the claims relating to the taking of silt without prejudice to a determination in the Court of Claims.

"10. The substitution of clear water from Pueblo Dam for the stream water with silt as diverted from the river has had certain adverse effects on the Bessemer Ditch system and the lands irrigated from the ditch. The silt in the water tended to seal the bed and banks of the ditch. Clear water leaks through the bottom and sides of the ditch in greater volume than silty water. More of the water passing the Bessemer Ditch gauging station about six miles below the original diversion point of the ditch seeps out of the bottom and sides of the ditch so that less of the diverted water reaches the points of delivery to Plaintiffs. There is an increase in the amount of aquatic vegetation growing in the ditch and the laterals. There has been an increase in erosion of the ditch and the laterals in places and sloughing off of material from the sides of the ditches into the bottom. There has been more seepage from the ditch into basements through the Pueblo reach of the ditch. When applied to land for irrigation, clear water does not spread as far as silty water." (Emphasis added.)

The plaintiffs alleged that the substitution of clear water for the naturally-silty water of the Arkansas River increased seepage losses and reduced the water's irrigative capacity with the combined effect that the water rights irrigated only one-half of the land which had been irrigated before the change in water quality occurred. Clear water scours the ditch and causes it to leak. As a result, the same quantity of water cannot be put to beneficial use by the owners of decreed rights.

I.

Colorado adopted the appropriation doctrine of water law in its Constitution. *Colo. Const.*, Art. XVI, Secs. 5 and 6. Frequently referred to as the "first-in-time, first-in-right" system, the appropriation doctrine was considered most conducive to the economic development of semi-arid western states such as Colorado. The doctrine encouraged the expenditure of labor and resources with the promise that a decreed appropriation would receive legal protection.

In *Coffin v. Left Hand Ditch Company,* 6 Colo. 443 (1882), the court discussed the importance of the appropriation doctrine in Colorado. "The climate [in Colorado] is dry, and the soil when moistened only by the usual rainfall, is arid and unproductive; except in a few favored sections, artificial irrigation for agriculture is an absolute necessity. Water in the various streams thus acquires a value unknown in moister climates. Instead of being a mere incident to the soil, it rises, when appropriated, to the dignity of a distinct usufructuary estate, or right of property. It has always been the policy of the national, as well as the territorial and state governments, to encourage the diversion and use of water in this country for agriculture; and vast expenditures of time and money have been made in reclaiming and fertilizing by irrigation portions of our unproductive territory. Houses have been built, and permanent improvements made; the soil has been cultivated, and thousands of acres have been rendered

immensely valuable, with the understanding that appropriations of water would be protected. Deny the doctrine of priority or superiority of right by priority of appropriation, and a great part of the value of all this property is at once destroyed."

Absent the assurance that validly appropriated water rights would receive legal protection, few persons could have made the substantial investments necessary to perfect a water appropriation.

The draftsmen of Colorado's Constitution, however, did not enumerate the components of a water right entitled to protection, nor specify which acts would be recognized as injurious to such rights. Consequently, the task of defining the substance of a water right fell to the courts and resulted in the adoption of several principles intended to afford appropriators the full benefit of the water which they had appropriated.

In *Larimer County Reservoir Co. v. People,* 8 Colo. 614, 9 P. 794 (1885), a case involving an onstream reservoir, this court declared that existing appropriations are entitled to protection against certain clearly specified types of injury:

"But the privilege [to construct an onstream reservoir] so recognized is, of course, qualified by the condition that no injury to others shall result through its invocation. He who attempts to appropriate water in this way does so at his peril. He must see to it that no legal right of prior appropriators, or of other persons, is in any way interfered with by his acts. *He cannot lessen the quantity of water, seriously impair its quality, or impede its natural flow, to the detriment of others who have acquired legal right therein superior of his* . . . ." (Emphasis added.)

Another principle intended to encourage the appropriation of water rights is that all decreed appropriators, whether junior or senior, are entitled to rely upon the continuation of stream conditions as they existed at the time the appropriation was made. *Farmers' Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 272 P.2d 629 (1954); *Comstock v. Ramsey,* 55 Colo. 244, 133 P. 1107 (1913); *Vogel v. Minnesota Canal Co.,* 47 Colo. 534, 107 P. 1108 (1910). Persons seeking a change in water rights which will injuriously affect other rights, therefore, must propose the imposition of conditions to prevent such injury or be denied the right to make the change. *City of Brighton v. Boulder Left Hand Ditch Co.,* 192 Colo. 219, 557 P.2d 1182 (1977); *Farmers' Highline Canal & Reservoir Co. v. City of Golden, supra.*[3]

---

[3] The General Assembly has enacted several statutes which are intended to guarantee decreed appropriators the protections first recognized by the courts. Section 37-80-120(3), C.R.S. 1973, provides that appropriators who store water upstream and substitute reservoir water for that which would have naturally flowed to decreed appropriators are subject to the following condition:

"(3) Any substituted water shall be of a *quality* and continuity to meet the requirements of the use to which the senior appropriation has normally been put." (Emphasis added.)

The importance of the protections afforded decreed appropriators is emphasized by the fact that irrigation appropriations are made by and for use of a specific tract of land, and only that amount of water reasonably necessary to irrigate that tract of land may be appropriated. *Mountain Meadow Ditch & Irrigation Co. v. Park Ditch & Reservoir Co.,* 130 Colo. 537, 277 P.2d 527 (1954); *Enlarged Southside Irrigation Ditch Co. v. John's Flood Ditch Co.,* 120 Colo. 423, 210 P.2d 982 (1949); *Baker v. City of Pueblo,* 87 Colo. 489, 289 P. 603 (1930); *White v. Nuckolls,* 49 Colo. 170, 112 P. 329 (1910); *Colorado Milling & Elevator Co. v. Larimer & Weld Irrigation Co.,* 26 Colo. 47, 56 P. 185 (1899). In *Baker v. City of Pueblo, supra,* we declared:

"Read into every decree, regardless of its language, is the unquestioned law of this state that an owner of a water priority may use the quantity awarded only when good irrigation usage justifies it, and when the needs of the land are satisfied, the water must no longer be used by him, but must be permitted to flow uninterrupted in the natural channel of the stream. *New Mercer Ditch Company v. Armstrong,* 21 Colo. 357, 40 Pac. 989. A right to use of water for irrigation is limited in time and volume by the needs of the land and the law reads this limitation into a decree declaring the right. *White v. Nuckolls,* 49 Colo. 170, 177, 122 Pac. 329."

Regardless of the amount of water which, according to his decree, an appropriator is allowed to divert, the amount which he is entitled to compel subsequent appropriators to leave in the stream is restricted to that amount which he has historically put to beneficial use. *Larimer Co. v. Poudre Valley Co.,* 23 Colo. App. 249, 129 P. 248 (1912); *Cache La Poudre Co. v. Supply Co.,* 29 Colo. 469, 68 P. 781 (1902); *Vogel v. Minnesota Canal Co., supra.* The core of an appropriator's protected expectations is that he will be able to continue to apply to beneficial use that amount and quality of water, within a reasonable range of acceptability, which he has historically applied. *See Farmers' Highline Canal & Reservoir Co. v. City of Golden, supra.*

Water flowing in a ditch accumulates or deposits silt as it seeks equilibrium. While searching for a state of equilibrium, clear water strips silt from the banks of the earthen ditch and causes increased seepage. Water

Similarly, section 37-92-305(5), C.R.S. 1973, provides:

"(5) In the case of plans for augmentation including exchange, the supplier may take an equivalent amount of water at his point of diversion or storage if such water is available without impairing the right of others. Any substituted water shall be of a *quality* and quantity so as to meet the requirements for which the water of the senior appropriator has normally been used, and such substituted water shall be accepted by the senior appropriator in substitution for water derived by the exercise of his decreed rights." (Emphasis added.)
The substituted water statutes are not applicable to this case, but deal with related problems and the issue of water quality.

which previously flowed through the Bessemer Ditch and was applied to beneficial use now disappears into the aquifer before it reaches the land to be irrigated and becomes part of the return flow of the Arkansas River. Moreover, when the remaining water is put to beneficial use in the irrigation of crops, a further loss occurs. Clear water, because of its fugitive or fugacious characteristics and its ability to penetrate and seep through soil in a greater quantity than naturally-silty water, escapes through the banks of the irrigation ditch in greater quantities and irrigates less land when it reaches the place of use than its silty counterpart. *See Logan Natural Gas & Fuel Co. v. Great Southern Gas & Oil Co.,* 126 F. 623 (6th Cir. 1903); *Triger v. Carter Oil Co.,* 372 Ill. 182, 23 N.E.2d 55 (1939). According to the stipulation in this case, the owner of a decreed right loses the use of a portion of the water which he has historically put to beneficial use.

The principles set forth in this dissenting opinion restricted the plaintiffs, and all irrigation appropriators in our state, to decrees that limited the quantity of water they could appropriate to that which was reasonably necessary to irrigate a specific tract of land. Since a change in water quality can affect the irrigative capacity and utility of a specific quantity of water appropriated, our courts have consistently recognized that appropriators are entitled to protection against detrimental changes in water quality. *Larimer County Reservoir Co. v. People, supra.* The question of what constitutes a "diminution" in the quality of water must, therefore, be analyzed in terms of the use to which the water is put. An appropriator's expectations can just as easily be defeated by altering the quality of water as by changing the quantity. Thus, one aspect of an appropriation is the right to continue to receive water of the quality upon which the appropriator relied in making his appropriation. Because the defendants in this case altered the quality of the water which the plaintiffs receive, plaintiffs have been deprived of a quantity of water which they historically received and put to beneficial use.

Acceptance of the United States' argument that a Colorado water right does not entitle its holder to the naturally-occurring silt present in a natural stream, within a reasonable range of acceptability, would require us to declare that the plaintiffs and other appropriators who hold decrees to specific quantities of water should have originally appropriated that quantity of naturally-silty water which, absent the silt, would reasonably irrigate their lands. Yet, any attempt to obtain a decree for a quantity in excess of actual needs, in anticipation of a change in water quality, would have been properly denied. *Baker v. City of Pueblo, supra.* We should not alter well-established principles of water law to the detriment of those who have reasonably relied upon the promises inherent in the appropriation doctrine.

Although the various property components of a Colorado water right are not specifically enumerated in our Constitution, statutory law, or case law, the substance of the right is indicated and defined by the protections afforded against specific types of injury. Protection against diminution of water quantity is most easily recognized. If a junior appropriator causes a reduction in the quantity of water delivered to a senior appropriator, the injury is obvious. Similarly, a change in the water's natural quality, which denies existing appropriators the full measure of their rights, whether by the addition of a pollutant or by the removal of a naturally-occurring element such as silt, also constitutes injury.[4] The crucial consideration is that water rights which were appropriated for a specific purpose and which were limited in quantity to that amount necessary to achieve that purpose, are no longer sufficient to satisfy that purpose as a result of the change in water quality. The injury inflicted by the change in water quality under such circumstances lessens the value of the water rights and constitutes damage which is cognizable under Colorado Law.

## II.

The heart of the majority opinion is to be found in its statement that: "The 'quality' requirement of the statute is not violated when a person slows down the movement of water, resulting in the settling of silt to the bottom and leaving only clear water for the senior appropriator. Further, we regard the storage of water, with consequent settling of silt to the bottom of the reservoir, as not constituting an unreasonable deterioration in quality." (Footnote omitted.)

The discussion of *Schodde v. Twin Falls Land & Water Co.,* 224 U.S. 107, 32 S.Ct. 470, 56 L.Ed.2d 686 (1911), and the citation of *Empire Water & Power Co. v. Cascade Town Co.,* 205 Fed. 123 (8th Cir. 1913), indicates the reasoning behind the majority opinion.

The majority's decision is based upon its perception that the natural consequence of any diversion is a reduction in the velocity of water. The result of a reduction in water velocity is the precipitation of the solids suspended in that water. Thus, the majority opinion, in my view, represents only a limited holding that a prior appropriator cannot claim compensation for damages which result from the natural and inescapable consequences of a diversion by a junior appropriator who employs usual methods of diverting water.

The methods of diversion which were considered in *Schodde v. Twin Falls Land & Water Co., supra,* and *Empire Water & Power Co. v.*

---

[4] We recognize that some recipients of water from the plaintiffs' ditch, particularly domestic water users, have been benefitted because they now receive clear, rather than silty water. Defendant's actions may have also created a more dependable water supply and may have provided plaintiffs with flood protection and portions of a new diversion system. The advantages conferred upon the plaintiffs relate to the issue of damages and are not before us for determination.

*Cascade Town Co., supra,* could not fulfill the decreed water right unless the natural volume and flow of the stream from which the water was diverted remained unchanged. Such methods of diversion are not compatible with principles of maximum utilization of water. But those diversion systems were based upon unique fact situations. The appropriator in *Schodde v. Twin Falls Land & Water Co., supra,* depended upon the movement of the water in the stream to turn a paddlewheel which pumped water into his ditches. The appropriator in *Empire Water & Power Co. v. Cascade Town Co., supra,* relied on the vapors from a natural waterfall to water plants placed upon the walls of a canyon. The plaintiffs in this case employ earthen ditches — the customary method of diverting water in this and most other jurisdictions.

The United States and the majority rely heavily upon principles enunciated in cases concerned with preventing inefficient diversions and encouraging the maximum utilization of scarce water resources. *Schodde v. Twin Falls Land & Water Co., supra; Empire Water & Power Co. v. Cascade Town Co., supra; Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968); *City of Colorado Springs v. Bender,* 148 Colo. 458, 366 P.2d 552 (1961).[5]

The essence of this argument is contained in the following excerpt from the United States' brief:

"Although plaintiffs are not monopolizing the entire flow of the stream to facilitate their *diversion* of the fraction of the flow to which they are entitled, they are claiming a right to the unimpeded flow to carry the intermittent silt load to facilitate the transportation of their water through an inefficient, leaky ditch to the place of use and the principle and the results are the same." (Emphasis in original.)

The importance of the principles relied upon by the United States cannot be overemphasized. Appropriators are not entitled to command the flow of an entire stream to effect an inefficient diversion. In *Fellhauer v. People, supra,* we committed this court to the concept of maximum utilization of water resources, subject to the condition that an appropriator could not be required to improve extraction or diversion facilities beyond his economic reach, in the light of all factors relating to the use and the proposed changes which would bring about a more efficient use.

But principles of maximum utilization have never been held to require that appropriators achieve absolute efficiency when they divert

---

[5] *City of Colorado Springs v. Bender, supra,* recognized that appropriators cannot command the entire flow of a stream to effect an inefficient diversion but did not signal a retreat from well-established principles intended to protect senior rights. In *Bender,* we said: "Fundamental among the principles applicable here is the rule that a junior appropriator may not divert the water to which he is entitled by any method or means the result of which will be to *diminish or interfere* with the right of a senior appropriator to full use of his appropriation." (Emphasis added.)

water and apply it to beneficial use. *See Colorado Springs v. Bender, supra; Middlekamp v. Bessemer,* 46 Colo. 102, 114-115, 103 P.280 (1909); *State ex rel. Crowley v. District Court,* 108 Mont. 89, 88 P.2d 23, 27 (1939); *Worden v. Alexander,* 108 Mont. 208, 90 P.2d 160, 162 (1939); *Joerger v. Pacific Gas & Electric Co.,* 207 Cal. 8, 276 P. 1017, 1024-1025 (1929); *Tulare Irrigation District v. Lindsay-Strathmore Irrigation District,* 3 Cal.2d 489, 45 P.2d 972, 1009-10 (1935). *But see, Glenn Dale Ranches, Inc. v. Shaub,* 94 Idaho 585, 494 P.2d 1029 (1972). "Maximum utilization" is not an incantation to be recited without regard for the realities faced by Colorado appropriators. This court should take notice of the fact that the great majority of the decreed water rights in Colorado are diverted through earthen ditches. We should refuse to hold that this widespread practice is *per se* unreasonable. *See Middlekamp v. Bessemer, supra,* where this court recognized that Bessemer's ditch was constructed in the ordinary and usual manner and that seepage is a necessary result because of the character of the land. The suggestion in the majority opinion that this court should require all Colorado appropriators to line their ditches is beyond our power and would have far reaching consequences for a large number of farmers in this state.

"[T]here is a vanishing point at which the possible waste of water would be more than overcome by the waste incidental to the abandonment of reasonably efficient diversion systems and the establishment of diversion systems whose expense is neither warranted nor permitted by the benefit to be derived from the water." *State ex rel. Crowley v. District Court, supra; see also Worden v. Alexander, supra; Whittlesey, Irrigation Development Potential in Colorado,* submitted to Department of Natural Resources, State of Colorado, May 1977.

The water which seeped through plaintiffs' ditch before construction of the Pueblo Dam was not "wasted," as the majority suggests, although it is unavailable for use by the plaintiffs. The water, so long as it was diverted and transported for application to beneficial use within the drainage basin of the Arkansas River, became part of the return flow of that stream. The clear water now supplied by defendant, because it lacks its natural silt content, escapes from plaintiffs' ditch in greater quantities than it did before the Pueblo Dam was constructed. That water, too, becomes part of the return flow of the Arkansas River. But it is made unavailable for its intended and historic use by the plaintiffs because it returns at an earlier time and in increased amounts to the Arkansas River, and therefore, cannot be put to the historic beneficial use.

Moreover, it has been suggested that lining ditches may actually reduce the amount of water available to Colorado appropriators. Water which now seeps into the ground and is stored in underground aquifers during its return to the stream may, if ditches are lined, have to be stored in above-ground reservoirs until it is needed, with accompanying increased

evaporation losses. *See Whittlesey, supra.* The significant possibility that the alternative system which the majority opinion alludes to could cause extreme economic hardship in return for illusory benefits should lead us to conclude that in this, as in every case, the question whether plaintiffs' method of diversion is consistent with the principles of maximum utilization is for the trier of fact. But well-settled principles of Colorado water law dictate that a senior appropriator cannot be forced to go beyond his "economic reach" to maintain his method of diversion when the acts of a junior make it more expensive for him to use the water to which he is historically entitled. *Colorado Springs v. Bender, supra.*

The principles enunciated in *Schodde v. Twin Falls Land & Water Co., supra,* cannot be extended to the factually-distinguishable situation presented in this proceeding. The plaintiffs do not seek to command the entire flow of the Arkansas River or the right to maintain the velocity of the stream to effect a diversion of naturally-silty water. Rather, they seek only that to which they are entitled under our appropriation system: the quantity of water under their decreed rights in its natural quality, within a reasonable range of acceptability. Only that quantity of water need be permitted to flow in the stream and maintain its natural quality.

The amount of silt suspended in the naturally-flowing waters of our natural streams necessarily varies according to the extent of appropriation, the season, the quantity and velocity of water in the stream, and the geological "age" of the stream. Junior appropriators reduce the water velocity and cause the silt concentration to decrease. Return flow, however, may increase the degree of silt concentration. Regardless of whether junior appropriators cause a net increase or decrease in silt concentration, senior appropriators cannot demand that a specific quantity of silt be present in the water which they divert and apply to beneficial use. It would violate the principle of maximum utilization of our scarce water resources to allow an appropriator to insist upon a particular quantity of silt in the water which he appropriates.

An appropriator who has diverted water and applied it to beneficial use has not thereby secured a right to have any particular amount of silt suspended in the water to which he is entitled. Silt is not a property right, but it is one measure of water quality. It is impossible to state with certainty how much silt a particular appropriator is entitled to demand, but an appropriator has the right to receive water which is within a reasonable range of acceptable quality.

To come within the purview of this court's principle of maximum utilization, an appropriator's method of diversion must be reasonably efficient. The necessary degree of efficiency cannot be expressed in a single equation. In determining whether a diversion system is reasonably efficient, an issue exists as to whether the earthen ditches are well-constructed and maintained and conform to the conditions and customs of the locality

where the water diversion occurs and is applied to beneficial use. *See Middlekamp v. Bessemer, supra.*

If the plaintiffs' ditch was inefficient before construction of the Pueblo Dam, the plaintiffs cannot rely upon the continuing presence of the natural silt in the stream to maintain an inefficient method of diversion. Senior and junior appropriators have reciprocal duties which derive from their relative positions. One of the obligations imposed upon plaintiffs is that they not maintain an inefficient method of diversion to the detriment of a junior appropriator's right to divert and apply water. *Fellhauer v. People, supra.* But junior appropriators cannot act in such a way that a senior appropriator's decreed water right becomes no more than an empty promise. Plaintiffs' "right is to divert and use the water, not merely to have it left in the streambed." *State ex rel. Crowley v. District Court,* 108 Mont. 89, 88 P.2d 23, 27 (1939).

Senior appropriators cannot demand that a quantity of water in excess of that necessary to satisfy their decrees remain in the stream to maintain an acceptable concentration of silt. Senior appropriators are, however, entitled to that silt concentration which naturally results from the free flow of the natural stream in the quantity of their decrees. Any water in excess of that amount remains subject to appropriation to ensure the maximum utilization of our scarce water resources.

In my opinion, the question certified to this court should be answered in the affirmative.

MR. JUSTICE LEE and MR. JUSTICE CARRIGAN have authorized me to say that they join me in this dissent.